FILED IN
COURT OF CRIMINAL APPEALS

March 31, 2015

ABEL ACOSTA, CLERK

PD-1263-14
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/30/2015 5:18:35 PM
Accepted 3/31/2015 9:28:40 AM
ABEL ACOSTA
CLERK

No. PD-1263-14

# IN THE COURT OF CRIMINAL APPEALS
## AUSTIN, TEXAS

---

## MICHAEL ANTHONY MCGRUDER

## VS.

## THE STATE OF TEXAS

---

ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
FROM THE TENTH COURT OF APPEALS
WACO, TEXAS
COURT OF APPEALS NO. 10-13-00109-CR

---

## STATE'S BRIEF

---

JARVIS PARSONS
DISTRICT ATTORNEY
BRAZOS COUNTY, TEXAS

Jessica Escue
Assistant District Attorney
300 E. 26th Street, Suite 310
Bryan, Texas 77803
(979) 361-4320
(979) 361-4368 (Facsimile)
jescue@brazoscountytx.gov
State Bar No. 24059726

# IDENTITY OF PARTIES AND COUNSEL

APPELLANT:                          Michael McGruder

Trial Counsel:                      Bruno Shimek
                                    218 North Main
                                    Bryan, Texas 77803

Appellate Counsel:                  Mary Jo Holloway
                                    10222 Old Stagecoach
                                    Chappell Hill, Texas 77426
                                    Mjholloway44@hotmail.com

THE STATE OF TEXAS:                 Jarvis Parsons
                                    District Attorney

Trial Counsel:                      Brian Baker & Jessica Escue
                                    Assistant District Attorney
                                    300 E. 26th Street, Suite 310
                                    Bryan, Texas 77803

Appellate Counsel:                  Jessica Escue
                                    Assistant District Attorney
                                    300 E. 26th Street, Suite 310
                                    Bryan, Texas 77803
                                    jescue@brazoscountytx.gov

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ................................................................. i

TABLE OF CONTENTS ......................................................................................... ii

INDEX OF AUTHORITIES .................................................................................... iii

STATEMENT OF THE CASE ................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 2

SUMMARY OF THE ARGUMENT ....................................................................... 11

STATE'S RESPONSE TO APPELLANT'S POINT OF ERROR ............................ 12

**Tex. Transp. Code § 724.012(b)(3)(B) is facially constitutional, as a warrantless blood draw of a defendant who is validly arrested for driving while intoxicated and has at least two prior convictions for driving while intoxicated is reasonable under the Fourth Amendment.**

PRAYER .................................................................................................................. 22

CERTIFICATE OF SERVICE ................................................................................ 23

CERTIFICATE OF COMPLIANCE ....................................................................... 23

# INDEX OF AUTHORITIES

## CASES

*Maryland v. King,* 133 S.Ct. 1958 (2013) ..................................................... 16-19, 21

*United States v. Knights,* 534 U.S. 112 (2001) ............................................. 17-18, 21

*Ex parte Lo,* 424 S.W.3d 10 (Tex. Crim. App. 2013) .............................................13

*McGruder v. State,* No. 10-13-00109-CR, ___S.W.3d ___, 2014 WL 3973089 (Tex. App.—Waco Aug. 14, 2014, pet. granted) ......................................................2

*Missouri v. McNeely,* ___ U.S. ___, 133 S.Ct. 1552 (2013) ....................................16

*State v. Rosseau,* 396 S.W.3d 550 (Tex. Crim. App. 2013) .............................. 13-14

*Samson v. California,* 547 U.S. 843 (2006)..................................................... 18-19, 21

*New Jersey v. T.L.O.,* 469 U.S. 325 (1985) .............................................................21

*Vernoia School Dist. 47J v. Acton*, 515 U.S. 646 (1995) ...................................17, 21

## STATUTES

 Tex. Transp. Code § 724.012(b)(3)(B) ..................................... 2, 11, 15-17, 21-22

## REPORTS / STUDIES

James Fell, *Repeat DWI Offenders in the United States, in* TRAFFIC TECH:

TECHNOLOGY TRANSFER SERIES (National Highway Traffic Safety Administration

1995..................................................................................................................20

LIANG Y. LIU, DWI RECIDIVISM IN TEXAS 1987-1990, 13 (Texas Commission on

Alcohol And Drug Abuse, 1993) ...........................................................................20

NATHAN WARREN-KIGENYI & HEIDI COLEMAN, DWI RECIDIVISM IN THE UNITED
STATES: AN EXAMINATION OF STATE-LEVEL DRIVER DATA AND THE EFFECT OF
LOOK-BACK PERIODS ON RECIDIVISM PREVALENCE, 1 (National Highway Traffic
Safety Administration, 2014).........................................................................9, 19

No. PD-1263-14

IN THE COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS

_____

MICHAEL ANTHONY MCGRUDER

VS.

THE STATE OF TEXAS

_____

ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
FROM THE TENTH COURT OF APPEALS
WACO, TEXAS
COURT OF APPEALS NO. 10-13-00109-CR

_____

STATE'S BRIEF

_____

TO THE HONORABLE COURT CRIMINAL OF APPEALS:

COMES NOW, the State of Texas, by and through its District Attorney, and files this brief in response to the point of error alleged by Appellant, and would respectfully show the Court the following:

## STATEMENT OF THE CASE

On December 1, 2011, Appellant was indicted for the felony offense of driving while intoxicated. (CR at 1). On March 21, 2013, Appellant waived his right to a jury (2 RR 7) and entered a plea of not guilty. (2 RR 9). The trial court found Appellant guilty of the offense. (3 RR 26). The trial court found the two

1

enhancement paragraphs to be true, and assessed punishment at 30 years in the institutional division of the Texas Department of Criminal Justice. (4 RR 32). Notice of Appeal was filed on April 1, 2013. (CR 7).

On August 14, 2014, the Tenth Court of Appeals affirmed Appellant's conviction in an opinion which held that Tex. Transp. Code § 724.012 is not facially unconstitutional. *McGruder v. State,* No. 10-13-00109-CR, ___S.W.3d ___, 2014 WL 3973089 (Tex. App.—Waco Aug. 14, 2014, pet. granted). On October 16, 2014, Appellant filed his Petition for Discretionary Review with this Court. Petition for Discretionary Review was granted on January 28, 2015 by this Court on the issue: "Did the Court of Appeals err in finding the Appellant's facial constitutional challenge to Texas Transportation Code Section 724.012(b)(3)(B) failed and presumed the statute to be constitutionally valid?" (Appellant's Brief, p. 4).

## STATEMENT OF FACTS

**Greg Silber** (Investigator with the Brazos County District Attorney's Office) testified that, as a fingerprint expert, he took inked prints from Appellant. (2 RR 18). He compared Appellant's known fingerprints (State's exhibits 32A) with the fingerprints in State's exhibit 32 (misdemeanor conviction for DWI; cause no. 93-0719) and State's exhibit 34 (felony conviction for DWI; cause no. 23.230-

2

361). He confirmed that Appellant's prints were found in State's exhibits 32 and 34. (2 RR 19).

**Officer Jay Summers** (College Station Police Department) stated that he was on patrol the early morning hours of September 27, 2011. (2 RR 25, 46). Around 12:19 a.m., there was a call to dispatch concerning a black male who had frightened someone in the parking lot of the University Place Condominiums. (2 RR 25). The male was described as being heavy set, wearing gray shorts and driving a red truck with a lot of junk in the back of it. (2 RR 25). Because Summers was on another call, Officers Paris and Ingram initially responded (2 RR 25), and Paris was considered the primary officer. (2 RR 37).

After he finished his previous call, Summers saw the red truck, with junk in the back, pass by him. (2 RR 28). He pulled in behind the truck; it continued a short period of time before parking in the Southgate Village apartment complex. (2 RR 29). While following the red truck, Officer Fisher passed the truck head on. (2 RR 30). Summers never lost sight of the truck; he saw the truck park and saw the driver (Appellant) get out of the vehicle. (2 RR 31, 34). Summers called over to Appellant and told him to stop. (2 RR 35). Appellant complied. Because of the earlier suspicious person call, Summers wanted to investigate why Appellant was over at the University Place Condominiums. (2 RR 35). Summers noted that Appellant smelled of alcohol. (2 RR 36).

3

Because Summers was not the primary officer, he called Officer Paris to complete his investigation. (2 RR 38). Summers listened to Paris' interview of Appellant. (2 RR 38). Initially, Appellant was cooperative. As the interview went on, Appellant stated that he had walked over to Southgate, not driven. (2 RR 38). Summers said that Appellant's responses did not make sense. Although Summers was seven to ten feet away, he continued to smell alcohol, coming from Appellant, while Appellant was being interviewed by Paris. (2 RR 39). State's exhibit 5 (police car mobile video, with no audio) was admitted. (2 RR 41). The time of the stop showed 12:32 a.m. on the video.

Appellant refused Officer Paris' request to perform field sobriety tests. (2 RR 38). After the investigation was complete, Appellant was arrested. (2 RR 44). Appellant had stated that he did not live at Southgate Village Apartments; he was just visiting. (2 RR 45). Because he did not live at Southgate Village Apartments, Appellant's truck could not be legally parked in the parking lot. (2 RR 45). Consequently, Appellant's truck was inventoried prior to towing it. (2 RR 44). State's exhibit 14 was a photo of the front passenger seat area showing a unopened can of Miller High Life beer. (2 RR 45). Summers stated that, based on his training and experience, Appellant was without the normal use of his mental faculties due to the introduction of alcohol. (2 RR 46).

4

On cross-examination, Summers estimated that Appellant was detained approximately twenty to twenty-five minutes before his arrest. (2 RR 48). There were four to five officers on the scene. (2 RR 48). Summers agreed that "there was some heated confrontation" between Appellant and the officers. (2 RR 48). Summers did not see the truck speed or make an improper turn. (2 RR 50). He could not explain why his body microphone, that supplied audio for the mobile video, did not turn on. (2 RR 52).

On redirect, Summers stated that he became frustrated with Appellant because of the nonsensical answers he gave to Officer Paris' questions and because he had lied when he said that he wasn't driving. (2 RR 54).

**Officer Matthew Paris** testified that, on September 27, 2011, he was still in the "ghost phase" training; his supervising officer was Officer Ingram. (2 RR 62). At 12:19 a.m., a call came in reporting a suspicious person. (2 RR 62). The person was described as a black male wearing a gray T-shirt driving an older model red Ford truck with furniture in the bed. (2 RR 63). He responded to the University Place Condominiums and did not locate the red truck. (2 RR 64). He then drove to Southgate Village Apartments. (2 RR 65). He saw Officer Summers' and Fisher's patrol cars; he saw a black male wearing a gray t-shirt and gray shorts, later identified as Appellant. (2 RR 67). Also located was the red truck with furniture. (2 RR 68). Paris asked Appellant if he had been over at the University Place

5

Condominium apartments; he said he had not. (2 RR 71). Appellant also said that he had done nothing wrong and wanted to know why the officers were questioning him. (2 RR 71). Paris noticed that Appellant was sweating, and he was not standing still but shifting from foot to foot–possibly to conceal his swaying. (2 RR 72). Appellant also smelled of alcohol. Appellant denied being at the University Place Condominium apartments and said he was coming from his house. (2 RR 72). He said that he had walked from his home at 1118 Phoenix to Southgate to visit his girlfriend. (2 RR 74). When asked if he had been drinking, Appellant stated "I had – paused for a minute and told me [Paris] no." (2 RR 74). When confronted with the fact that Paris could smell alcohol on Appellant's breath, Appellant changed his story and said that he had had one beer at 6:00 p.m. (2 RR 75). Paris stated that one forty ounce King Cobra beer (2 RR 76), ingested six hours earlier, was not consistent with the odor of alcohol and behavior that he was witnessing. (2 RR 75). He asked Appellant to perform field sobriety tests to determine if Appellant was safe to drive. (2 RR 75). Appellant refused. (2 RR 76). Appellant was asked how drunk he was, on a scale of one to ten—with a ten being the most intoxicated he had ever been. (2 RR 76). Appellant "rated himself a 10 or a 20." Appellant was placed under arrest for DWI. Paris then read the admonishments required in the DIC 24 form, that let him know the consequences for failing to provide a breath or blood sample. (2 RR 77).

State's exhibit 18 (mobile video of Paris' interaction with Appellant) was admitted, in part, as to the portion covering the police's initial interaction with Appellant to determine if he was intoxicated. (2 RR 85). The trial court suppressed any statement made by Appellant after he was arrested and placed into the squad car until the police stopped questioning him. (2 RR 85). However, the trial court held that all statements in State's exhibit 18, that were volunteered by Appellant while in the squad car after questioning had stopped, were admitted. (2 RR 85).

Paris stated that Appellant had a soda in his hand at the time of contact. (2 RR 88). He inventoried the truck; State's exhibit 14 showed an unopened 32 ounce Miller High Life beer, cool to the touch, in the interior of the truck. (2 RR 89).

After the truck was inventoried and the wrecker took possession of it, Paris transported Appellant to the police department to write a search warrant for his blood. (2 RR 90). He did not know, at that point, that Appellant had two prior convictions for DWI. However, he later learned of Appellant's two priors for DWI. (2 RR 91). He then disregarded preparing the search warrant, filled out the mandatory blood draw form and obtained a blood draw kit. (2 RR 91). He stated that he abandoned obtaining the search warrant for blood because it takes time to get a warrant and "every bit of time matters because his body is eliminating the alcohol that's in his system." (2 RR 91).

State's exhibit 19 (videotape of the blood draw) was admitted. (2 RR 94). State's exhibits 23 and 24 were still photos taken from the video. (2 RR 95). Paris' initial contact with Appellant was at 12:32 a.m. (2 RR 95). Time of arrest was 1:02 a.m. (2 RR 100). State's exhibit 24 and 28 showed the time of the blood draw to be 2:15 a.m.—approximately one hour and forty-five minutes later. (2 RR 96, 99, 100). (2 RR 99). State's exhibits 20-22 were photos taken of the blood draw. (2 RR 94). State's exhibits 25 (blood kit box) and 26 (blood vial) were admitted. (2 RR 99). After obtaining Appellant's blood, he was released to the jail at 2:27 a.m.; the blood evidence was put into the evidence drop box of the police department. (2 RR 101).

On cross-examination, Paris conceded that he had never contacted Appellant before and did not know what his normal speech or voice was. (2 RR 102). Appellant was already outside the truck when Paris arrived; he did not see Appellant operate the truck. (2 RR 104). Paris stated that the following indicated Appellant was intoxicated: admission to drinking; stating he did not drive when two officers had seen him driving the truck; odor of alcohol; had trouble putting his words together at times. (2 RR 104).

During the contact with Appellant, he wasn't being cooperative and was frustrated. (2 RR 105-106). It was possible that Appellant thought that the range of intoxication was a 1 to 100 scale, but it was clearly stated that it was a one to ten

8

scale. (2 RR 106). Appellant appeared nervous because he was sweating and stuttered at the beginning of his sentences. (2 RR 106). Officer Summers indicated in his report that he did not note any problems with Appellant's speech or balance. (2 RR 108, 117). Before Paris activated his mobile video, Officer Summers had dispatch run Appellant's driver's license; it had expired. (2 RR 112). Paris found out that Appellant had two priors DWI convictions when he was back at the police department preparing the search warrant. (2 RR 112-113).

**Tomika Warren** was a phlebotomist at the College Station Medical Center. (2 RR 118). On September 27, 2011, she took blood from Appellant at 2:15 a.m. (2 RR 123, 124).

On cross-examination, she stated that Appellant cooperated during the blood draw. (2 RR 126).

**Anna Mudd** (DPS forensic scientist) obtained the blood sample vial (State's exhibit 26) contained in the box (State's exhibit 25). (2 RR 137). She tested the blood for alcohol concentration on two different days. (2 RR 141). Her test on October 27th resulted in values of .0985 and .0991 units of grams of alcohol per 100 milliliters of blood. (2 RR 145). The October 28th test resulted in values of .0983 and .0988. The reporting value was .09 at 2:15 a.m. on September 27, 2011. (2 RR 146, 148). State's exhibit 31 was the report she generated from her tests. (2 RR 146-147). The legal limit in Texas is .08. (2 RR 148).

9

Mudd testified that the body typically eliminates alcohol at a range of .01 to .03 grams of alcohol per 100 milliliters of blood per hour. (2 RR 151). As soon as alcohol is absorbed, the body is actively trying to eliminate it from the body.

**Officer Michael Fisher** (College Station Police Department) stated that, on September 27, 2011, he initially responded to University Place Condominiums concerning the suspicious person call. (2 RR 156). He had remembered seeing a vehicle, that matched the suspect vehicle, at Southgate Village Apartments earlier in the night. (2 RR 157). He went there to see if the truck was present. (2 RR 157). He was leaving the Southgate Village Apartments when Appellant and Officer Summers passed him. (2 RR 161). He turned around and located Summers talking to Appellant, whom he had just seen driving the truck. (2 RR 162). Fisher opined that Appellant was intoxicated because he was having a hard time remembering statements he had made and continually repeated himself. He also initially said he was driving and then said he was not. (2 RR 165). Fisher specifically asked Appellant, on a scale of one to ten, if he was intoxicated. He said ten to twenty.

On cross-examination, Fisher stated that he did not see the truck commit any traffic violations when it passed by. (2 RR 170). He did not know Appellant's normal speech patterns. (2 RR 172).

**Officer William Snell** (College Station Police Department) stated that he was on patrol on January 25, 2013. (3 RR 5). He made contact with Appellant at

10

11:42 a.m. During that contact, Appellant provided a telephone number for Appellant's girlfriend (Sherri Stoval) of (979) 402-0684. (3 RR 5).

**Sergeant Anna Sifuentes** (Brazos County Jail custodian of records; 3 RR 7) testified that she pulled all the booking records for Appellant. (3 RR 7). State's exhibits 36, 37, 38 and 40 were admitted. (3 RR 8).

Pursuant to subpoena, Sifuentes also retrieved all phone calls made from the jail to (979) 402-0684. (3 RR 10). Twenty-two phone calls were made on September 27, 2011 from the jail intake area. (3 RR 10). State's exhibit 39 contained the phone calls to (979) 402-0684 and was admitted. (3 RR 12-13). Two of the phone calls were played for the trial court. (3 RR 13).

## SUMMARY OF THE STATE'S ARGUMENT

Appellant argues that the Tenth Court of Appeals erred in its opinion which found Tex. Transp. Code § 724.012(b)(3)(B) facially constitutional, because (1) Appellant was not making solely a facial challenge to the statute; and (2) the statute is unconstitutional because it permits a "mandatory blood draw in the absence of a warrant or a recognized exception to a warrant." First, a clear reading of the record reveals that Appellant was making only a facial challenge to the statute, as his complaint was based on the statute's allowance of a warrantless blood draw for all defendants arrested for DWI with two or more prior convictions -- not on the specific facts of Appellant's case.

11

Second, the warrantless blood draw authorized under Tex. Transp. Code § 724.012(b)(3)(B) is facially constitutional because the search is reasonable under the Fourth Amendment. The government has a substantial interest in protecting the public against the dangers of repeat DWI offenders. Studies show individuals who have been arrested at least twice for driving while intoxicated are significantly more likely than the average law-abiding citizen to be arrested for DWI in the four years following their arrest, more likely to refuse to submit a blood or breath sample when arrested for a subsequent DWI, and more likely to be involved in a fatal crash. The government's substantial interest in protecting the public outweighs the privacy interest of a defendant who (1) is arrested under valid probable cause for driving while intoxicated, and (2) has at least two prior convictions for driving while intoxicated. Consequently, since a warrantless blood draw in these circumstances is reasonable under the Fourth Amendment, Tex. Transp. Code § 724.012(b)(3)(B) is facially constitutional.

## RESPONSE TO APPELLANT'S POINT OF ERROR

**Tex. Transp. Code § 724.012(b)(3)(B) is facially constitutional, as a warrantless blood draw of a defendant who is validly arrested for driving while intoxicated and has at least two prior convictions for driving while intoxicated is reasonable under the Fourth Amendment.**

Appellant argues that the Tenth Court of Appeals erred in its opinion which found Tex. Transp. Code § 724.012(b)(3)(B) facially constitutional, because (1)

Appellant was not making solely a facial challenge to the statute; and (2) the statute is unconstitutional because it permits a "mandatory blood draw in the absence of a warrant or a recognized exception to a warrant." However, a clear view of the record demonstrates that Appellant was only making a facial challenge to the statute when he objected at trial. Furthermore, it is clear that section 724.012(b)(3)(B) is not facially unconstitutional, as a warrantless blood draw of a suspect who was arrested for DWI based on probable cause, and has previously been convicted at least twice of DWI in the past, is reasonable under the Fourth Amendment.

### *Standard of Review*

Whether a statute is facially constitutional is a question of law that is reviewed *de novo*. *Ex parte Lo,* 424 S.W.3d 10, 14-15 (Tex. Crim. App. 2013). A statute is presumed constitutionally valid, and the burden of showing its unconstitutionality lies with the party challenging the statute. *Id.* at 15. In order to prevail on a facial constitutional challenge, the party challenging the statute "must establish that the statute always operates unconstitutionally in all possible circumstances." *State v. Rosseau,* 396 S.W.3d 550, 557 (Tex. Crim. App. 2013).

### *Objection at Trial*

Although Appellant argues that the Tenth Court of Appeals erred in applying "a 'hyper-technical' analysis in determining [that] McGruder was making only a

13

facial challenge,"[1] it is clear from Appellant's objection at trial that he was only making a facial challenge to the statute. While a facial challenge alleges that the statute is unconstitutional in all situations, an as-applied challenge depends "on development of the specific facts of the case showing how the statute is being applied to the defendant." *Rosseau,* 398 S.W.3d at 778. The record from trial clearly showed that Appellant was solely making a facial challenge:

> Q. [By Ms. Escue] I'm going to show you state's Exhibits 25 and 26. Do you recognize these exhibits?
>
> A. [Officer Paris] Yes, ma'am.
>
> Q. What are they?
>
> A. It's the sealed blood kit --
>
> Q. Okay.
>
> A. -- that we used.
>
> Q. And how can you tell that it's the same one that you used?
>
> A. Got my initials on it from where I sealed it and my name and handwriting on the end where I submitted it as evidence.
>
> Q. Other than the testing does it look like it's been tampered with or altered with in any way since the last time you saw it?
>
> A. No.
>
> MS. ESCUE: Your Honor, I offer State's Exhibits 25 and 26 into evidence.

---

[1]  (Appellant's brief at 5).

14

MR. SHIMEK: Judge, I'm going to object to State's Exhibit 25 and 26, first of all, on the basis that Section 724.012 of the Texas Transportation Code is unconstitutional in that it denies the defendant due process, allows for the collection of evidence without a search warrant, it's a violation of search and seizure; and for that reason I object to it under that basis.

Further I'd object in that there's been -- actually no probable cause established to draw the blood in the first place, and so this blood was seized without -- or drawn without adequate probable cause to -- without adequate probable cause that an offense even occurred. For that reason I'd object on that basis as well.

THE COURT: Why do you think the statute is unconstitutional and do you have any case law that --

MR. SHIMEK: Haven't found any cases to support it. I believe it's unconstitutional because I think it's a violation of due process and protection clause of both the U.S. and federal (sic) Constitutions. The -- essentially the basis is that it puts a person who's had two DWIs in a position to have items from his body seized, a search done without a warrant − a search done without a warrant and a search done -- it allows for wide abuse of the -- of a person who is in that position, abuse of that person's individual rights; and it does not afford that person the protection of a -- of an unbiased magistrate to review whether or not there's probable cause to think that an offense even because of the fact that under this statute it puts persons in Mr. McGruder's position in a different position than every other person in the state of Texas. And so he's denied equal protection under that -- he's denied equal protection, he's denied the right to have a fair and impartial magistrate review whether or not there's probable cause that exists for a search of his person to be even done; and a search of a person is so invasive that I believe that this statute would be unconstitutional. Have not been able to find any case law to support that, and I believe that it is unconstitutional.

THE COURT: Don't we deprive a lot of people of their Constitutional rights because they've been convicted?

15

MR. SHIMEK: We do; but we shouldn't in this case, Judge. It sets up a clear pattern -- clear ability for an officer without probable cause to submit -- make a person submit to a blood draw that a magistrate can't even review.

THE COURT: Objection overruled. The exhibits will be admitted -- or -- both of them are just one?

MS. ESCUE: Both. It's 25 and 26, 25 is the box and 26 is the actual vial.

THE COURT: 25 and 26 are admitted.

(2 RR 97-99).

Consequently, Appellant's argument that the court of appeals erred in only assessing his objection as a facial challenge is without merit.

## *Reasonableness*

Appellant's second argument -- that the court of appeals erred finding Tex. Transp. Code § 724.012(b)(3)(B) facially constitutional -- is without merit, because the warrantless blood draw of an individual who (1) is arrested under valid probable cause for driving while intoxicated, and (2) has at least two prior convictions for driving while intoxicated, is reasonable under the Fourth Amendment.

The Fourth Amendment to the United States Constitution states, "[t]he right of the people to be secure in their persons, houses, papers and effects, against **unreasonable** searches and seizures, shall not be violated…" U.S. CONST. amend. IV (emphasis added). A blood draw of a DWI suspect is undoubtedly a search under the Fourth Amendment. *See Missouri v. McNeely,* ___ U.S. ___, 133 S.Ct.

16

1552, 1558 (2013). However, the Fourth Amendment only prohibits **<u>unreasonable</u>** searches. *Vernoia School Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995) ("As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'"). The Supreme Court has held:

> In some circumstances, such as when faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions or the like, the Court has found that certain general, or individual circumstances may render a warrantless search or seizure unreasonable. Those circumstances diminished the need for a warrant, either because the public interest is such that neither a warrant nor probable cause is required or because the individual is already on notice, for instance because of his employment, or the conditions of his release from government custody, that some reasonable police intrusion on his privacy is to be expected.

*Maryland v. King,* 133 S.Ct. 1958, 1969-70 (2013) (internal citations and quotations omitted).

Where the public interest is high and the defendant's reasonable expectation of privacy is low, the Supreme Court has often found that a search without a warrant is not an "unreasonable search" under the Fourth Amendment. *See United States v. Knights,* 534 U.S. 112, 119-21 (2001) (search of probationer's home based on reasonable suspicion and without a warrant was not prohibited by the Fourth Amendment because the lesser degree of suspicion and lack of a warrant "satisfies the Constitution when the balance of governmental and private interest makes such a standard reasonable.").

17

## *Samson v. California*

In *Samson v. California,* the defendant was on parole when officers searched his home and found the methamphetamine that was the basis for his conviction. *Samson v. California,* 547 U.S. 843, 846-47 (2006). The search was solely based on the defendant's status as a parolee. *Id.* The Supreme Court, citing *Knights*, upheld the warrantless search as reasonable. *Id.* at 857. The Supreme Court found, that the defendant had a lesser expectation of privacy than normal, law abiding citizens because of his status as a parolee. *Id.* at 852. Furthermore, the State had a "substantial" interest in monitoring individuals on parole, as parolees are more likely to commit crimes and a State has a valid interest in reducing recidivism. *Id.* at 853. Therefore, "promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Id.*

## *Maryland v. King*

Similarly, in *Maryland v. King,* the defendant was arrested for assault and booked into custody. *King,* 133 S.Ct. at 1966. When he was booked into custody, detectives obtained a DNA sample from the defendant without a warrant and placed the results into a DNA database. *Id.* The defendant's DNA matched an unsolved rape case. *Id.* As a result, the defendant was convicted of the unsolved rape and sentenced to life in prison. *Id.* On appeal, the defendant claimed the

warrantless search, which obtained his DNA, was unreasonable under the Fourth Amendment. *Id.*

The Supreme Court held that such a search was constitutional under the Fourth Amendment because the governmental interest in obtaining the DNA – "the need for law enforcement officers in a safe and accurate way to process and identify the persons and possessions they must take into custody" – was high. *Id.* at 1970. Furthermore, the legitimate expectations of privacy of someone who has been arrested and is in the process of being booked into custody is low. *Id.* at 1978. Consequently, this combination rendered the search constitutional. *Id.* at 1980.

*Government Interest in Warrantless Search*

Like *Samson* and *King,* the governmental interest in allowing the warrantless blood draw of a defendant who 1) has been validly arrested under probable cause for driving while intoxicated and 2) has been twice convicted of driving while intoxicated, is high. Nation-wide, thirty-one percent of fatal crashes involve an alcohol-impaired driver. *See* NATHAN WARREN-KIGENYI & HEIDI COLEMAN, DWI RECIDIVISM IN THE UNITED STATES: AN EXAMINATION OF STATE-LEVEL DRIVER DATA AND THE EFFECT OF LOOK-BACK PERIODS ON RECIDIVISM PREVALENCE, 1 (National Highway Traffic Safety Administration, 2014) (attached as Appendix 1). Fifty-five percent of individuals arrested for driving while intoxicated in Texas

have been arrested before for driving while intoxicated. *See* LIANG Y. LIU, DWI RECIDIVISM IN TEXAS 1987-1990, 13 (Texas Commission on Alcohol And Drug Abuse, 1993) (attached as Appendix 2).  Thirty-one percent of individuals who have been arrested two times for DWI will be arrested for an additional DWI within four years. *Id.* That number increases to thirty-nine percent for individuals who have been arrested at least three times.  *Id.* Additionally, individuals who have been arrested at least twice for driving while intoxicated are more likely to refuse to submit a blood or breath sample when arrested for a subsequent DWI and more likely to be involved in a fatal crash. James Fell, *Repeat DWI Offenders in the United States, in* TRAFFIC TECH: TECHNOLOGY TRANSFER SERIES (National Highway Traffic Safety Administration 1995) (attached as Appendix 3); Warrant-Kigenyi, *supra* at 2-5; Liu, *supra* at 2-5, 12-13, 17-18.   Consequently, the government interest in finding and protecting the public from the danger posed by repeat DWI offenders is high.

### *Reasonable Expectation of Privacy*

Defendants who have been validly arrested for driving while intoxicated and have two or more previous convictions for driving while intoxicated have a lesser expectation of privacy in the alcohol content of their blood or breath. "Once an individual has been arrested on probable cause for a dangerous offense that may require detention before trial … his or her expectations of privacy and freedom

from police scrutiny are reduced." *King,* 133 S.Ct. at 1970. The fact that these defendants have also been previously convicted for driving while intoxicated at least twice before further diminishes any reasonable expectation of privacy in their blood or breath. *See Samson,* 547 U.S. at 848 (defendant on parole had a lesser expectation of privacy in his home to justify officers' warrantless search); *Knights,* 534 U.S. at 119 ("Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable condition that deprive the offender of some freedoms enjoyed by law-abiding citizens."); *Vernoia School Dist. 47J,* 515 U.S. at 654 ("[T]he legitimacy of certain privacy expectations vis-à-vis the State may depend upon the individual's legal relationship with the State."). Just as the parolee in *Samson* and probationer in *Knights* had a lesser expectation of privacy in their homes because of their criminal history, a defendant with two or more convictions for driving while intoxicated has a lesser expectation of privacy in the alcohol content of their blood.

Like *King* and *Samson,* when the substantial government interest in protecting the public against the danger posed by repeat DWI offenders is weighed against the privacy interests of a defendant in custody for DWI, who has at least twice before been convicted of DWI, it is clear that a warrantless blood draw in these circumstances does not offend the Fourth Amendment. *See King,* 133 S.Ct. at 1978-80; *Samson,* 547 U.S. at 854; *New Jersey v. T.L.O.,* 469 U.S. 325, 337

21

(1985) ("Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place."). Consequently, Tex. Transp. Code § 724.012(b)(3)(B) is facially constitutional, because the warrantless blood draw of an individual who (1) is arrested under valid probable cause for driving while intoxicated, and (2) has at least two prior convictions for driving while intoxicated, is reasonable under the Fourth Amendment.

## PRAYER

Wherefore, premises considered, the State of Texas respectfully prays that this Court find that Appellant's point of error be overruled, and that the conviction be in all things affirmed.

Respectfully submitted,

JARVIS PARSONS
DISTRICT ATTORNEY
BRAZOS COUNTY, TEXAS


_/s/_ *Jessica Escue*

Jessica Escue
Assistant District Attorney
State Bar No. 24059726

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing State's Brief was electronically served on Mary Jo Holloway, Attorney for Appellant at mjholloway44@hotmail.com, on this 30th day of March, 2015.

/s/ *Jessica Escue*

Jessica Escue

## CERTIFICATE OF COMPLIANCE WITH TEX. R. APP. P. 9.4

I certify that the foregoing document has a word count of 4,928 based on the word count program in Word 2010.

/s/ *Jessica Escue*

Jessica Escue

PD-1263-14
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/30/2015 5:15:30 PM
Accepted 3/31/2015 9:29:45 AM
ABEL ACOSTA
CLERK

# Appendix 1



**U.S. Department of Transportation**

**National Highway Traffic Safety Administration**

# TRAFFIC SAFETY FACTS
## Research Note

**NHTSA**
www.nhtsa.gov

DOT HS 811 991

March 2014

# DWI Recidivism in the United States: An Examination of State-Level Driver Data and the Effect of Look-Back Periods on Recidivism Prevalence

*By Nathan Warren-Kigenyi and Heidi Coleman*

In 1995, the National Highway Traffic Safety Administration estimated that one-third of all drivers arrested or convicted of driving while intoxicated (DWI) were repeat offenders. This study was conducted to update the 1995 estimate, and it determined that since 1995 the proportion of recidivism among drivers arrested for DWI has decreased from 31% to 25%, a decline of 19%. This report describes the methods used for data collection and analysis. The analysis explored emerging trends of recidivism based on data regarding arrests, convictions, and license suspensions. This study also examined the extent to which recidivism prevalence differs based on the look-back period used by the State (i.e., the period of time DWI offenses remain on driver records as prior offenses).

## Background

In 1995, the National Highway Traffic Safety Administration estimated that one-third of all drivers arrested or convicted of DWI were repeat offenders (Fell, 1995). This statistic continues to be cited, although it was calculated nearly 20 years ago (Chaudhary, Tison, McCartt, & Fields, 2011; Eibner, Morral, Pacula, & MacDonald, 2006; Gur et al., 2007; Jones, Lacey, Berning, & Fell, 1996; Kasar, Gleichgerrcht, Keskinkilic, Tabo, & Manes, 2010; Lapham, Stout, Laxton, & Skipper, 2011; Lapham & England-Kennedy, 2012; Malek-Ahmadi, 2008; Ouimet et al., 2007; Voas, 2010; Warren, Nunez, Klepper, Rosario, & King, 2010; Zimmermann & Jackson, 2010, Sloan, Platt, & Chepke, 2011). In this article, NHTSA updates the estimate and expands its analysis.

The 1995 statistic was a national estimate of repeat DWI offenders in the United States, based on information collected from 12 States regarding their DWI arrests and convictions.

Since 1995, the number of DWI arrests has decreased by an estimated 25% (from 1.6 million in 1992 to 1.2 million in 2011) (Fell, 1995; Federal Bureau of Investigation [FBI], 2011). DWI arrests are also no longer the most common arrest category in the United States. DWI arrests now rank fifth behind property crime (1.6 million arrests), drug abuse violations (1.5 million arrests), larceny-theft (1.3 million arrests), and assaults (1.2 million arrests) (FBI, 2011). Although DWI arrests have decreased, DWI repeat offenders are still believed to make up a sizeable proportion of DWI arrests.

While the number and rate of alcohol-impaired drivers involved in fatal crashes has decreased significantly since 2002, the percentage of alcohol-impaired driving fatalities (fatal crashes involving at least one driver with a blood alcohol concentration [BAC] of .08 grams per deciliter [g/dL] or higher) has remained the same. The number of alcohol-impaired driving fatalities decreased by 27% in 10 years (from 13,472 in 2002 to 9,878 in 2011), and the rate of alcohol-impaired driving fatalities decreased by 28% (from 0.47 per 100 million vehicle miles traveled in 2002 to 0.34 in 2011) (National Highway Traffic Safety Administration [NHTSA], 2010; Sloan, Platt, & Chepke, 2011). The percentage of alcohol-impaired drivers involved in fatal crashes has remained relatively constant since 2002 at 31%. Of fatally injured drivers in crashes that involved a drinking driver in 2011, 66% (6,507) had BACs of .08 or higher (NHTSA, 2012). Historically, drivers with prior DWI convictions have been overrepresented in fatal crashes, and the risk

elevates for drivers with multiple DWI convictions (Fell, 1995; Sloan, Platt, & Chepke, 2011).

According to one study, only a small percentage of impaired drivers are detected and arrested; about one in 200 drivers (Beitel, Sharp, & Glauz, 2000). Another study estimated that there were 112 million alcohol-impaired driving episodes in 2010 and only 1% of drivers involved in those episodes were arrested (Bergen, Shults, & Rudd, 2011). The low percentage of arrests is believed to be due, in large part, to the low statistical probability that law enforcement agencies with limited resources can monitor all roads and drivers adequately.

States apply a variety of sanctions for impaired drivers through their courts and administrative license suspension and revocation systems. The severity of the sanctions varies depending on the offender's BAC level at the time of arrest, whether the individual is a repeat offender and other risk factors. Having accurate estimates of recidivism prevalence can help inform decisions related to the selection of appropriate sanctions, the allocation of resources and strategic planning.

This paper seeks to update and expand the 1995 analysis.

# Methods

Data was sought from all 50 States and Puerto Rico. NHTSA hoped to obtain State-specific data from 2007 to 2011 regarding DWI offenders in three categories:

1. Drivers arrested for DWI

2. Drivers convicted of DWI

3. Drivers with license revocations or suspensions for DWI

NHTSA also sought to obtain data on the number of repeat offenders in each category, and the look-back period for DWI offenses in each State. Look-back periods are the period of time DWI offenses remain on a driver's record as prior offenses.

If data were available in one or two categories, the State was included in the analysis if recidivist data were available also for the category. In some cases, information about the look-back period was obtained from NHTSA's National Center for Statistics and Analysis.

Previous arrests were used as the numerator in all three categories to calculate recidivism prevalence in order to capture the largest number of subjects. The

conviction and license suspension categories overlap the arrest category. Using previous arrests also controls for the different adjudication processes States use to punish DWI offenders. For example, following an arrest, offenders in some States may lose their driver's license administratively, but may not be convicted of an impaired-driving offense. An offender in other States may be convicted of an impaired-driving offense and may be required to install an ignition interlock or be granted a conditional driver's license, but may not be subject to a license suspension. Data would be reported regarding the offenders in all of these States based on the arrest, but may or may not be reported based on the conviction and license suspension. The previous arrests category includes data from all States regardless of how offenders are processed.

## Data Analysis

The data were coded, entered into Microsoft Excel 2010, and analyzed using descriptive procedures to calculate recidivism prevalence. Weighted means were calculated to take into account the number of drivers in each State. The categories were also stratified by two look-back periods, 10-years or longer (longer) and less than 10-years (shorter), to examine the extent to which the recidivism prevalence differs by look-back period. To account for States that could not provide information for all of the years requested (2007 to 2011), yearly State data was aggregated to calculate the recidivism prevalence. All of the analyses were performed using Excel.

## Results

From April to October 2012, NHTSA obtained information on DWI arrests and recidivism from 40 States. Information that fit the criteria for at least one of the categories was obtained from 36 States. Categorical breakdowns are as follows: NHTSA obtained information that fit the criteria for Category 1 (arrests) from 13 States, Category 2 (convictions) from 22 States, and Category 3 (suspensions or revocations) from 18 States.

In Category 1 (arrests), DWI recidivism ranged from 11 to 41%, the median was 25% and the weighted mean was 25%. Minnesota had the highest percentage of repeat DWI offenders with 41%, and Mississippi had the lowest percentage of repeat DWI offenders with 11%. The number of drivers arrested for DWI in each State varied significantly, but there was no relationship between the number of drivers arrested and the percentage of repeat offenders. For instance, Minnesota had 166,962 DWI arrests with 41% recidivism; North

Dakota had 18,485 DWI arrests with 29% recidivism; Missouri had 185,273 DWI arrests with 13% recidivism; and West Virginia had 46,454 DWI arrests with 20% recidivism. The figures are detailed in Table 1.

Table 1

| | **Drivers Arrested for DWI** | | | | |
|---|---|---|---|---|---|
| **State** | **# of Drivers Arrested for DWI** | **# of Drivers With Prior DWI Arrest** | **Year** | **Percent Repeat DWI Offenders** | **Look-Back Period (Years)** |
| CT | 19,813 | 4,986 | 2007–2011 | 25% | 10 |
| DE | 30,859 | 10,750 | 2007–2011 | 35% | 10 |
| IL | 185,583 | 30,069 | 2007–2010 | 16% | Lifetime |
| IN | 191,994 | 75,977 | 2007–2011 | 40% | Lifetime |
| MN | 166,962 | 67,832 | 2007–2011 | 41% | Lifetime |
| MO | 185,273 | 23,550 | 2007–2011 | 13% | 10 |
| MS | 152,185 | 17,325 | 2007–2011 | 11% | 5 |
| ND | 18,485 | 5,453 | 2009–2011 | 29% | 7 |
| NY | 104,673 | 22,477 | 2007–2010 | 21% | 10 |
| OK | 92,957 | 25,538 | 2007–2011 | 27% | 10 |
| UT | 74,739 | 28,258 | 2007–2011 | 38% | 10 |
| VA | 179,081 | 35,414 | 2007–2011 | 20% | 5 |
| WV | 46,454 | 9,260 | 2007–2011 | 20% | 10 |

| Median | 25% |
|---|---|
| Weighted Mean | 25% |
| Range | 11–41% |

In Category 2 (convictions), DWI recidivism ranged from 11 to 69%, the median was 29.5% and the weighted mean was 30%. Pennsylvania had the highest percentage of repeat DWI offenders with 69%, and Mississippi had the lowest percentage of DWI offenders with 11%. California only had data for 2007, 2008, and 2009, but had the highest total of DWI convictions with 498,347 and 26% recidivism. In comparison, North Dakota had the lowest number of DWI convictions (15,103) with 36% recidivism, and Delaware had the second lowest number of DWI convictions (19,723) with 26% recidivism. The figures are detailed in Table 2.

Table 2

| | **Drivers Convicted of DWI** | | | | |
|---|---|---|---|---|---|
| **State** | **# of Drivers Convicted of DWI** | **# of Drivers With Prior DWI Arrests** | **Year** | **Percent Repeat DWI Offenders** | **Look-Back Period (Years)** |
| AZ | 115,979 | 24,308 | 2007–2011 | 21% | 7 |
| CA | 498,347 | 131,284 | 2007–2009 | 26% | 10 |
| CT | 21,044 | 4,260 | 2007–2011 | 20% | 10 |
| DE | 19,723 | 5,086 | 2007–2011 | 26% | 10 |
| FL | 194,872 | 50,422 | 2007–2011 | 26% | 100 |
| GA | 184,224 | 61,031 | 2007–2011 | 33% | Lifetime |
| IA | 79,549 | 28,230 | 2007–2011 | 35% | 5 |
| IL | 73,836 | 9,334 | 2007–2010 | 13% | Lifetime |
| IN | 151,222 | 64,450 | 2007–2011 | 43% | Lifetime |
| MN | 137,029 | 58,473 | 2007–2011 | 43% | Lifetime |
| MO | 87,021 | 18,634 | 2007–2011 | 21% | 10 |
| MS | 135,393 | 15,451 | 2007–2011 | 11% | 5 |
| MT | 33,727 | 5,730 | 2007–2011 | 17% | 25 |
| NE | 55,008 | 20,861 | 2007–2011 | 38% | 12 |
| ND | 15,103 | 5,453 | 2009–2011 | 36% | 7 |
| OH | 224,428 | 76,033 | 2007–2011 | 34% | 6 |
| OK | 42,955 | 16,073 | 2007–2011 | 37% | 10 |
| OR | 31,525 | 6,664 | 2007–2009 | 21% | 10/15* |
| PA | 74,051 | 50,883 | 2008–2010 | 69% | 20 |
| SC | 57,334 | 31,698 | 2007–2011 | 55% | 10 |
| UT | 37,204 | 15,761 | 2007–2011 | 42% | 10 |
| VA | 148,915 | 24,191 | 2007–2011 | 16% | 5 |

| Median | 29.5% |
|---|---|
| Weighted Mean | 30% |
| Range | 11–69% |

*The look-back period is 15 years for offenders with diverted sentences

In Category 3 (suspensions), DWI recidivism ranged from 11–73%, the median was 34% and the weighted mean was 32%. Vermont had the highest percentage of repeat DWI offenders with 73%, and Mississippi had the lowest percentage of DWI offenders with 11%. Category 3 had the highest total of States with recidivism prevalences of 40% or greater: Florida (58%), Iowa (40%), Indiana (43%), Minnesota (41%), Utah (59%), and Vermont (73%). The figures are detailed in Table 3.

Table 3

| State | # of Drivers With Suspensions for DWI | # of Drivers With Prior DWI Arrests | Year | Percent Repeat DWI Offenders | Look-Back Period (Years) |
|---|---|---|---|---|---|
| | **Drivers With License Revocations or Suspensions for DWI** | | | | |
| AZ | 115,979 | 24,308 | 2007–2011 | 21% | 7 |
| CA | 709,952 | 193,115 | 2007–2010 | 27% | 10 |
| CT | 21,275 | 3,641 | 2007–2011 | 17% | 10 |
| FL | 166,852 | 97,052 | 2007–2011 | 58% | 100 |
| GA | 202,188 | 58,642 | 2007–2011 | 29% | Lifetime |
| IA | 102,404 | 40,737 | 2007–2011 | 40% | 5 |
| IN | 178,917 | 76,787 | 2007–2011 | 43% | Lifetime |
| MN | 166,962 | 67,832 | 2007–2011 | 41% | Lifetime |
| MO | 37,938 | 12,759 | 2007–2011 | 34% | 10 |
| MS | 135,393 | 15,451 | 2007–2011 | 11% | 5 |
| ND | 15,891 | 5,453 | 2009–2011 | 34% | 7 |
| NE | 48,576 | 17,808 | 2007–2011 | 37% | 12 |
| OK | 79,187 | 28,370 | 2007–2011 | 36% | 10 |
| SC | 84,733 | 14,235 | 2007–2011 | 17% | 10 |
| UT | 70,560 | 41,409 | 2007–2011 | 59% | 10 |
| VA | 148,915 | 24,191 | 2007–2011 | 16% | 5 |
| VT | 28,132 | 20,474 | 2007–2011 | 73% | Lifetime |
| WV | 46,454 | 9,260 | 2007–2011 | 20% | 10 |

| Median | 34% |
|---|---|
| Weighted Mean | 32% |
| Range | 11–73% |

The analysis conducted in 1995 estimated the DWI recidivism prevalence to be 31% for arrests and 31.5% for convictions (Fell, 1995). This analysis estimates the median DWI recidivism prevalence to be 25% for arrests, 29.5% for convictions and 34% for license suspensions. The comparison is detailed in Table 4.

Table 4

| | Drivers Arrested for DWI | Drivers Convicted of DWI | Drivers With License Suspensions for DWI |
|---|---|---|---|
| **Comparison of Current Median DWI Recidivism Prevalence to the 1995 Analysis** | | | |
| Current DWI Recidivism Prevalence | 25% | 29.5% | 34% |
| 1995 DWI Recidivism Prevalence | 31% | 31.5% | — |

See Tables 4A-4D in the Appendix for complete comparison and analysis.

## Bivariate Analysis by Look-Back Period

In conducting this analysis, it became apparent that the States had a variety of look-back periods. Accordingly, to determine the extent to which look-back periods have an impact on recidivism prevalence, a bivariate analysis was conducted. In this analysis, States were divided into two groups: one with look-back periods of 10 years or more and the other with look-back periods of less than 10 years.

In Category 1 (arrests), there were 10 States with longer look-back periods and 3 States with shorter look-back periods. The percentage of recidivism ranged from 16–41% for States with longer look-back periods, and 11–29% for States with shorter look-back periods. The medians for the longer and shorter look-back periods were 26% and 20%, and the weighted means for the longer and shorter look-back periods were 27% and 17%, respectively. The comparisons are detailed in Tables 5A and 5B.

Table 5A

| State | # of Drivers Arrested for DWI | # of Drivers With Prior DWI Arrest | Year | Percent Repeat DWI Offenders | Look-Back Period (Years) |
|---|---|---|---|---|---|
| | **Drivers Arrested for DWI 10-Year or Longer Look-Back Period** | | | | |
| CT | 19,813 | 4,986 | 2007–2011 | 25% | 10 |
| DE | 30,859 | 10,750 | 2007–2011 | 35% | 10 |
| IL | 185,583 | 30,069 | 2007–2010 | 16% | Lifetime |
| IN | 191,994 | 75,977 | 2007–2011 | 40% | Lifetime |
| MN | 166,962 | 67,832 | 2007–2011 | 41% | Lifetime |
| MO | 185,273 | 23,550 | 2007–2011 | 13% | 10 |
| NY | 104,673 | 22,477 | 2007–2010 | 21% | 10 |
| OK | 92,957 | 25,538 | 2007–2011 | 27% | 10 |
| UT | 74,739 | 28,258 | 2007–2011 | 38% | 10 |
| WV | 46,454 | 9,260 | 2007–2011 | 20% | 10 |

Table 5B

| State | # of Drivers Arrested for DWI | # of Drivers With Prior DWI Arrest | Year | Percent Repeat DWI Offenders | Look-Back Period (Years) |
|---|---|---|---|---|---|
| | **Drivers Arrested for DWI Less than 10-Year Look-Back Period** | | | | |
| MS | 152,185 | 17,325 | 2007–2011 | 11% | 5 |
| ND | 18,485 | 5,453 | 2009–2011 | 29% | 7 |
| VA | 179,081 | 35,414 | 2007–2011 | 20% | 5 |

| | 10-Year or Longer Look-Back Period | Less Than 10-Year Look-Back Period |
|---|---|---|
| **Summary of Drivers Arrested Tables 5A-B** | | |
| Range | 16%–41% | 11%–29% |
| Median | 26% | 20% |
| Weighted Mean | 27% | 17% |

In Category 2 (convictions), there were 16 States with longer look-back periods and six States with shorter look-back periods. The percentage of recidivism ranged from 13 to 69% for States with longer look-back periods, and 11 to 36% for States with shorter look-back periods. The medians for the longer and shorter look-back periods were 29.5% and 27.5%, and the weighted means for the longer and shorter look-back periods were 32% and 24%, respectively. The comparisons are detailed in Tables 6A and 6B.

In Category 3 (suspensions), there were 13 States with longer look-back periods and five States with shorter look-back periods. The percentage of recidivism ranged from 17–73% for the States with longer look-back periods, and 11–40% for States with shorter look-back periods. The medians for the longer and shorter look-back periods were 36% and 21%, and the weighted means for the longer and shorter look-back periods were 35% and 21%, respectively. The comparisons are detailed in Tables 7A and 7B.

Table 6A

| | Drivers Convicted of DWI 10-Year or Longer Look-Back Period | | | | |
|---|---|---|---|---|---|
| State | # of Drivers Convicted of DWI | # of Drivers With Prior DWI Arrests | Year | Percent Repeat DWI Offenders | Look-Back Period (Years) |
| CA | 498,347 | 131,284 | 2007–2009 | 26% | 10 |
| CT | 21,044 | 4,260 | 2007–2011 | 20% | 10 |
| DE | 19,723 | 5,086 | 2007–2011 | 26% | 10 |
| FL | 194,872 | 50,422 | 2007–2011 | 26% | 100 |
| GA | 184,224 | 61,031 | 2007–2011 | 33% | 10 |
| IL | 73,836 | 9,334 | 2007–2010 | 13% | Lifetime |
| IN | 151,222 | 64,450 | 2007–2011 | 43% | Lifetime |
| MN | 137,029 | 58,473 | 2007–2011 | 43% | Lifetime |
| MO | 87,021 | 18,634 | 2007–2011 | 21% | 10 |
| MT | 33,727 | 5,730 | 2007–2011 | 17% | 25 |
| NE | 55,008 | 20,861 | 2007–2011 | 38% | 12 |
| OK | 42,955 | 16,073 | 2007–2011 | 37% | 10 |
| OR | 31,525 | 6,664 | 2007–2009 | 21% | 10–15 |
| PA | 74,051 | 50,883 | 2008–2010 | 69% | 20 |
| SC | 57,334 | 31,698 | 2007–2011 | 55% | 10 |
| UT | 37,204 | 15,761 | 2007–2011 | 42% | 10 |

Table 7A

| | Drivers With License Revocations or Suspensions for DWI 10-Year or Longer Look-Back Period | | | | |
|---|---|---|---|---|---|
| State | # of Drivers With Suspensions for DWI | # of Drivers With Prior DWI Arrests | Year | Percent Repeat DWI Offenders | Look-Back Period (Years) |
| CA | 709,952 | 193,115 | 2007–2010 | 27% | 10 |
| CT | 21,275 | 3,641 | 2007–2011 | 17% | 10 |
| FL | 166,852 | 97,052 | 2007–2011 | 58% | 100 |
| GA | 202,188 | 58,642 | 2007–2011 | 29% | 10 |
| IN | 178,917 | 76,787 | 2007–2011 | 43% | Lifetime |
| MN | 166,962 | 67,832 | 2007–2011 | 41% | Lifetime |
| MO | 37,938 | 12,759 | 2007–2011 | 34% | 10 |
| NE | 48,576 | 17,808 | 2007–2011 | 37% | 12 |
| OK | 79,187 | 28,370 | 2007–2011 | 36% | 10 |
| SC | 84,733 | 14,235 | 2007–2011 | 17% | 10 |
| UT | 70,560 | 41,409 | 2007–2011 | 59% | 10 |
| VT | 28,132 | 20,474 | 2007–2011 | 73% | Lifetime |
| WV | 46,454 | 9,260 | 2007–2011 | 20% | 10 |

Table 6B

| | Drivers Convicted of DWI Less Than 10-Year Look-Back Period | | | | |
|---|---|---|---|---|---|
| State | # of Drivers Convicted of DWI | # of Drivers With Prior DWI Arrests | Year | Percent Repeat DWI Offenders | Look-Back Period (Years) |
| AZ | 115,979 | 24,308 | 2007–2011 | 21% | 7 |
| IA | 79,549 | 28,230 | 2007–2011 | 35% | 5 |
| MS | 135,393 | 15,451 | 2007–2011 | 11% | 5 |
| ND | 15,103 | 5,453 | 2009–2011 | 36% | 7 |
| OH | 224,428 | 76,033 | 2007–2011 | 34% | 6 |
| VA | 148,915 | 24,191 | 2007–2011 | 16% | 5 |

Table 7B

| | Drivers With License Revocations or Suspensions for DWI Less Than 10-Year Look-Back Period | | | | |
|---|---|---|---|---|---|
| State | # of Drivers With Suspensions for DWI | # of Drivers With Prior DWI Arrests | Year | Percent Repeat DWI Offenders | Look-Back Period (Years) |
| AZ | 115,979 | 24,308 | 2007–2011 | 21% | 7 |
| IA | 102,404 | 40,737 | 2007–2011 | 40% | 5 |
| MS | 135,393 | 15,451 | 2007–2011 | 11% | 5 |
| ND | 15,891 | 5,453 | 2009–2011 | 34% | 7 |
| VA | 148,915 | 24,191 | 2007–2011 | 16% | 5 |

| Summary of Drivers Convicted Tables 6A-B | | |
|---|---|---|
| | 10-Year or Longer Look-Back Period | Less Than 10-Year Look-Back Period |
| Range | 13%–69% | 11%–36% |
| Median | 29.5% | 27.5% |
| Weighted Mean | 32% | 24% |

| Summary of Drivers With License Revocation or Suspension Tables 7A-B | | |
|---|---|---|
| | 10-Year or Longer Look-Back Period | Less than 10-Year Look-Back Period |
| Range | 17%–73% | 11%–40% |
| Median | 36% | 21% |
| Weighted Mean | 35% | 21% |

## Discussion

This analysis updated and expanded the previous recidivism analysis from 1995 in a number of distinct ways. This analysis included more States (36 States versus 12 States), used weighted means to account for the number of drivers in each State, collected information in three categories (arrests, convictions and license suspensions) as opposed to the two categories used in the previous analysis (arrests and convictions), and examined DWI recidivism prevalence by look-back period.

For the individual categories, the percentage of recidivists from the arrests category were consistently the lowest. The medians for the arrest, conviction, and suspension categories were 25%, 29.5%, and 34%; and the weighted means for the arrest, conviction, and suspension categories were 25%, 30%, and 32%, respectively. There were no noticeable trends for States that appeared in multiple categories.

When comparing the recidivism estimates by look-back period, a number of trends emerge. The weighted means for the longer look-back periods were higher than shorter look-back periods in all three categories: arrests (27% versus 17%), convictions (32% versus 24%) and license suspensions (35% versus 21%). The medians for the longer look-back periods were also higher than the shorter look-back periods in all three categories: arrests (26% versus 20%), convictions (29.5% versus 27.5), and license suspensions (36% versus 21%). States with longer look-back periods had more variability in the convictions and suspension categories as evidenced by the broader ranges: convictions (13 to 69% versus 11 to 36%) and license suspensions (17 to 73% versus 11 to 40%). There were no significant differences in variability for the arrests category; the longer look-back period States ranged from 16 to 41% and the shorter look-back periods States ranged from 11 to 29%.

NHTSA's National Center for Statistics and Analysis (NCSA) uses data captured by the Fatality Analysis Reporting System (FARS) to determine the number of drivers involved in fatal, alcohol-impaired-driving crashes who are repeat offenders. It should be noted that the NCSA recidivism calculation is based on fatal crashes, and is determined using a 3-year look-back period, which suggests their recidivism rate may be low. This study demonstrates that longer look-back periods have higher recidivism prevalence estimates.

Current estimates of DWI recidivism can be helpful in a number of different ways. For example, "specific deter-rence" strategies are those that are applied to "specific" offenders, such as driver license suspensions, installation of ignition interlocks, enrollment in DWI courts, other close supervision strategies or jail for individuals who are arrested and convicted of impaired driving. "General deterrence" strategies are those that are applied "in general" to drivers who may drive impaired, but haven't yet been arrested and entered the criminal justice system. Current DWI recidivism estimates can help policy makers, criminal justice professionals and other State and local officials determine the scope of the problem and make informed decisions about which specific or general deterrence strategies they should apply and the level of resources that should be dedicated to each type. This type of data can be used by State and local officials also to measure the impacts of the strategies they select.

## Limitations

There were a number of limitations related to the information that NHTSA was able to obtain. There is no national or centralized database of State DWI recidivism data, so State estimates were calculated based on data from different State databases. This study did not differentiate between the different definitions States use for DWI offenders. For example, drug impaired offenders could be included in some of the State DWI recidivism estimates, but may not be included in others. There were several limitations using the previously arrested variable in all three categories to calculate recidivism estimates. Although arrests permit the capture of more data because the convictions and license suspension categories overlap with the arrest category, arrests do not necessarily mean the drivers were guilty of the alleged crime. The arrest figures also do not reflect the number of individuals who have been arrested; rather, the arrest data shows the number of times people are arrested and some people may have been arrested multiple times. It should also be noted that the States in the categories for this analysis differed from the States used in the previous 1995 analysis.

Also, it should be noted that it is impossible to obtain fully accurate data on recidivism rates as many offenders take many impaired driving trips before they are detected by law enforcement. The more effective law enforcement activity is in detecting or deterring DWI offenders and the more resources devoted to DWI enforcement in a jurisdiction, the greater the rate of repeat offenders being detected and caught.

## Conclusion

The prevalence of DWI recidivism is important in that it can improve the allocation of resources expended to reduce DWI. If only a small number of DWIs are responsible for a relatively large percentage of impaired driving trips and crashes, then from a policy and programmatic perspective one would like to devote considerable effort implementing specific deterrent programs targeting these repeat offenders. However, if most crashes and impaired driving trips are due to drivers without prior offenses then a general deterrence approach would be indicated. The allocation of resources between these two complimentary approaches should be informed by data on recidivism rates.

Our findings indicate that the prevalence of DWI recidivism may have decreased since the initial analysis in 1995 by 19% for arrests (31% in 1995 versus 25% in 2010) and 6% for convictions (31.5% versus 29.5%). This study enhanced and added several elements to make the analysis more robust than the previous one. More States were included in this analysis, recidivism was analyzed from different categorical perspectives, and recidivism was compared and analyzed by look-back period.

The lowest prevalence estimate was in the arrest category and this estimate was believed to be the best indicator among the three categories, because it controlled for the various adjudication processes States use to punish DWI offenders, captured the greatest number of offenders, and had the least variability between the three categories.

The look-back period analysis provided evidence that shorter look-back periods result in lower DWI recidivism prevalence. The look-back period for the States in this analysis ranged from five years to lifetime. The prevalence was highest for the States with longer look-back periods and lowest for the States with shorter look-back periods in every category. These findings indicate that caution should be used when comparing and calculating prevalence estimates using various look-back periods, and that shorter look-back periods may underestimate the prevalence of recidivism.

## Future Implications on Policy

A number of interventions have been implemented over the past 20 years that are designed to reduce recidivism among DWI offenders. Some of these interventions are applied judicially; others through administrative action. They include DWI courts, alcohol ignition interlocks, vehicle and license plate sanctions, and various forms of close supervision of DWI offenders. Evaluations for many of these interventions can be found in *Countermeasures That Work* and published elsewhere in the literature (NHTSA, 2010). Some or all of these interventions may have played a role in the reduction of DWI recidivism over the past 20 years.

The larger number of States from which we obtained data in this study compared to previous studies should have improved the estimate of recidivism. Also, the wide availability of relatively long look-back periods suggests that these long look-back periods should always be used when a number is needed for programmatic purposes. Decision-makers should be able to base their decisions on all of the available data and not some arbitrarily small subset. This study clearly shows that the longer look-back periods result in higher recidivism rates and this information would be useful when allocating resources.

# Appendix

Table 4A

| | Drivers Arrested for DWI | | | | |
|---|---|---|---|---|---|
| State | # of Drivers Arrested for DWI | # of Drivers With Prior DWI Arrest | Year | Percent Repeat DWI Offenders | Look-Back Period (Years) |
| CT | 19,813 | 4,986 | 2007–2011 | 25% | 10 |
| DE | 30,859 | 10,750 | 2007–2011 | 35% | 10 |
| IL | 185,583 | 30,069 | 2007–2010 | 16% | Lifetime |
| IN | 191,994 | 75,977 | 2007–2011 | 40% | Lifetime |
| MN | 166,962 | 67,832 | 2007–2011 | 41% | Lifetime |
| MO | 185,273 | 23,550 | 2007–2011 | 13% | 10 |
| MS | 152,185 | 17,325 | 2007–2011 | 11% | 5 |
| ND | 18,485 | 5,453 | 2009–2011 | 29% | 7 |
| NY | 104,673 | 22,477 | 2007–2010 | 21% | 10 |
| OK | 92,957 | 25,538 | 2007–2011 | 27% | 10 |
| UT | 74,739 | 28,258 | 2007–2011 | 38% | 10 |
| VA | 179,081 | 35,414 | 2007–2011 | 20% | 5 |
| WV | 46,454 | 9,260 | 2007–2011 | 20% | 10 |

| | |
|---|---|
| Range | 11%–41% |
| Median | 25% |
| Weighted Mean | 25% |

Table 4B

| Drivers Arrested for DWI (1995 Analysis) | | | | | |
|---|---|---|---|---|---|
| State | # of Drivers with Suspensions for DWI | # of Drivers With Prior DWI Arrests | Year | Percent Repeat DWI Offenders | Look-Back Period (Years) |
| CO | 99,848 | 26,335 | 1989–1991 | 26% | 5 |
| MN | 30,717 | 14,034 | 1993 | 46% | 30 |
| SD | 8,821 | 2,090 | 1993 | 24% | 5 |
| TX | 352,372 | 125,941 | 1987–1990 | 36% | 10 |

| | |
|---|---|
| Range | 24%–46% |
| Median | 31% |
| Weighted Mean | 34% |

Table 4C

| Drivers Convicted of DWI | | | | | |
|---|---|---|---|---|---|
| State | # of Drivers Convicted for DWI | # of Drivers With Prior DWI Arrests | Year | Percent Repeat DWI Offenders | Look-Back Period (Years) |
| AZ | 115,979 | 24,308 | 2007–2011 | 21% | 7 |
| CA | 498,347 | 131,284 | 2007–2009 | 26% | 10 |
| CT | 21,044 | 4,260 | 2007–2011 | 20% | 10 |
| DE | 19,723 | 5,086 | 2007–2011 | 26% | 10 |
| FL | 194,872 | 50,422 | 2007–2011 | 26% | 100 |
| GA | 184,224 | 61,031 | 2007–2011 | 33% | 10 |
| IA | 79,549 | 28,230 | 2007–2011 | 35% | 5 |
| IL | 73,836 | 9,334 | 2007–2010 | 13% | Lifetime |
| IN | 151,222 | 64,450 | 2007–2011 | 43% | Lifetime |
| MN | 137,029 | 58,473 | 2007–2011 | 43% | Lifetime |
| MO | 87,021 | 18,634 | 2007–2011 | 21% | 10 |
| MS | 135,393 | 15,451 | 2007–2011 | 11% | 5 |
| MT | 33,727 | 5,730 | 2007–2011 | 17% | 25 |
| NE | 55,008 | 20,861 | 2007–2011 | 38% | 12 |
| ND | 15,103 | 5,453 | 2009–2011 | 36% | 7 |
| OH | 224,428 | 76,033 | 2007–2011 | 34% | 6 |
| OK | 42,955 | 16,073 | 2007–2011 | 37% | 10 |
| OR | 31,525 | 6,664 | 2007–2009 | 21% | 10–15 |
| PA | 74,051 | 50,883 | 2008–2010 | 69% | 20 |
| SC | 57,334 | 31,698 | 2007–2011 | 55% | 10 |
| UT | 37,204 | 15,761 | 2007–2011 | 42% | 10 |
| VA | 148,915 | 24,191 | 2007–2011 | 16% | 5 |

| | |
|---|---|
| Range | 11%–69% |
| Median | 29.5% |
| Weighted Mean | 30% |

Table 4D

| Drivers Convicted of DWI (1995 Analysis) | | | | | |
|---|---|---|---|---|---|
| State | # of Drivers Convicted of DWI | # of Drivers With Prior DWI Arrests | Year | Percent Repeat DWI Offenders | Look-Back Period (Years) |
| CA | 216,453 | 72,728 | 1998 | 34% | 7 |
| IA | 18,000 | 3,780 | 1992 | 21% | 6 |
| LA | 101,161 | 24,918 | 1989–1993 | 24% | 5 |
| NE | 146,619 | 38,547 | 1965–1994 | 26% | 30 |
| NM | 16,184 | 7,637 | 1990 | 47% | 30 |
| NC | 65,714 | 21,028 | 1988 | 32% | 7 |
| OH | 637,678 | 211,280 | 1980–1993 | 33% | 5 |
| WI | 169,390 | 52,073 | 1984–1988 | 31% | 5 |

| | |
|---|---|
| Range | 21%–47% |
| Median | 31.5% |
| Weighted Mean | 32% |

# References

Ahlin, E. M., Zador, P. L., Rauch, W. J., Howard, J. M., & Duncan, G. D. (2011). First-time DWI offenders are at risk of recidivating regardless of sanctions imposed. *Journal of Criminal Justice, 39*, 137–142.

Beitel, G. A., Sharp, M. C., & Glauz, W. D. (2000). Probability of arrest while driving under the influence of alcohol. *Injury Prevention, 6*, 158–161.

Bergen, G., Shults, R. A., & Rudd, R. A. (2011). Vital signs: alcohol-impaired driving among adults–United States, 2010. *Morbidity and Mortality Weekly Report, 60*, 1351–1356.

Chaudhary, N. K., Tison, J., McCartt, A. T., & Fields, M. (2011). Patterns of recidivism related to case dispositions of alcohol-impaired driving offenses. *Traffic Injury Prevention, 12*, 210–216.

Eibner, C., Morral, A. R., Pacula, R. L., & MacDonald, J. (2006). Is the drug court model exportable? The cost-effectiveness of a driving-under-the-influence court. *Journal of Substance Abuse Treatment, 31*, 75–85.

Federal Bureau of Investigation. (n.d.). *Uniform crime report data for 2011: Table 29.* Washington, DC: Author. Retrieved www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2011/crime-in-the-u.s.-2011/tables/table-29

Fell, J. (1995). *Repeat DWI offenders in the United States. Traffic tech: Technology transfer series.* Washington, DC: National Highway Traffic Safety Administration. Retrieved from www.nhtsa.gov/people/outreach/traftech/1995/TT085.htm

Gur, R. E., Loughead, J., Kohler, C. G., Elliott, M. A., Lesko, K., Ruparel, K.,... Gur, K. C. (2007). Limbic activation associated with misidentification of fearful faces and flat affect in schizophrenia. *Archives of General Psychiatry, 64,* 1356.

Jones, R. K., Lacey, J. H., Berning, A. & Fell, J. C. (1996). Alternative sanctions for repeat DWI offenders. *40th Annual Proceedings of the Association for the Advancement of Automotive Medicine, 307–315.*

Kasar, M., Gleichgerrcht, E., Keskinkilic, C., Tabo, A., & Manes, F. F. (2010). Decision-making in people who relapsed to driving under the influence of alcohol. *Alcoholism: Clinical and Experimental Research, 34,* 2162–2168.

Lapham, S. C., Stout, R., Laxton, G., & Skipper, B. J. (2011). Persistence of addictive disorders in a first-offender driving while impaired population. *Archives of General Psychiatry, 68,* 1151.

Lapham, S., & England-Kennedy, E. (2012). Convicted driving-while-impaired offenders' views on effectiveness of sanctions and treatment. *Qualitative Health Research, 22,* 17–30.

Malek-Ahmadi, J. (2008). *Legal status of alcohol, population density, and the incidence of DUI arrests in Alabama* (Doctoral dissertation). Auburn University, Auburn, AL.

Goodwin, A., Kirley, B., Sandt, L., Hall, W., Thomas, L., O'Brien, N., & Summerlin, D. (2013). *Countermeasures that work: A highway safety countermeasure guide for state highway safety offices* (7th ed., DOT HS 811 727). Washington, DC: Author.

National Highway Traffic Safety Administration. (2010). *Countermeasures that work: A highway safety countermeasure guide for state highway safety offices* (5th ed.. DOT HS 811 258). Washington, DC: Author. Retrieved from www.nhtsa.gov/staticfiles/nti/enforcement/pdf/Countermeasures_HS811258.pdf

National Highway Traffic Safety Administration. (2010). *Traffic safety facts—2010 Data: State alcohol-impaired driving estimates* (DOT HS 811 612). Washington, DC: Author.

National Highway Traffic Safety Administration. (2012). *Alcohol-impaired driving. Traffic safety facts—2011 Data* (DOT HS 811 700). Washington, DC: National Highway Traffic Safety Administration.

Ouimet, M. C., Brown, T. G., Nadeau, L., Lepage, M., Pelletier, M., Couture, S., ... Ng Ying Kin, N. M. (2007). Neurocognitive characteristics of DUI recidivists. *Accident Analysis & Prevention, 39,* 743–750.

Sloan, F., Platt, A., & Chepke, L. (2011). *Deterring Rearrests for Drinking and Driving.* Durham, NC: Duke University.

Voas, R. B. (2010). Monitoring drinking. *Transportation Research Record: Journal of the Transportation Research Board, 2182,* 1–7.

Warren, J. A., Nunez, J., Klepper, K. K., Rosario, R., & King, G. R. (2010). Driving under the influence (DUI) programs: One state's reality and all states' responsibility (Article #82). In G. R. Walz, J. C. Bleuer, & R. K. Yep, (Eds.), *Ideas and Research You Can Use: VISTAS 2010.* Alexandria, VA: American Counseling Association. Retrieved from http://counselingoutfitters.com/vistas/vistas_2010_TOC-section_12.htm

Zimmermann, C. M., & Jackson, G. P. (2010). Gas chromatography tandem mass spectrometry for biomarkers of alcohol abuse in human hair. *Therapeutic Drug Monitor, 32,* 216.



U.S. Department
of Transportation

**National Highway
Traffic Safety
Administration**

This research note and other general information on highway traffic safety may be accessed by Internet users at: www.nrd.nhtsa.dot.gov/CATS/index.aspx

# Appendix 2

# DWI RECIDIVISM IN TEXAS:
## 1987 through 1990



# Texas Commission on
# Alcohol and Drug Abuse
BRINGING TEXAS A NEW VIEW OF HUMAN POTENTIAL.

# DWI RECIDIVISM IN TEXAS, 1987–1990

Released
January 1993

Texas Commission on Alcohol and Drug Abuse

# DWI RECIDIVISM IN TEXAS, 1987-1990

## Liang Y. Liu, Ph.D.

## ACKNOWLEDGEMENTS

This study could not have been completed without the contributions of a number of people. Special recognition should go to Eric Fredlund, Ph.D., Lead Research Associate at TCADA, who designed and created the initial Texas DWI recidivism project, contributed parts of Chapter 2, and provided many valuable suggestions and guidance throughout. Robby Duffield, Director of Offender Education Services at TCADA, prepared parts of Chapter 2 and made many helpful comments on the draft. Jennifer Kavinsky, M.A., Research Editor at TCADA designed and edited and coordinated the production of the final report. Finally, Elaine Keith at Applications Programming, Texas Department of Public Safety, gave much assistance in provided the necessary data for the DWI Recidivism Tracking System (DWIRTS). The DWIRTS system was originally developed by TCADA under a contract from the Texas Department of Transportation.

© January 1993, Texas Commission on Alcohol and Drug Abuse (TCADA), Austin, Texas. TCADA grants full permission to reproduce and distribute any part of this document for non-commercial use. Appropriate credit is appreciated. TCADA is a state agency headed by six commissioners appointed by the governor. TCADA provides educational materials on substance use, develops prevention, intervention, and treatment programs, and conducts studies on the problems of substance use in Texas.



Texas Commission on Alcohol and Drug Abuse
9001 North IH-35, Suite 105
Austin, Texas 78753-5233
(512) 349-6600, (800) 832-9623
Web site: www.tcada.state.tx.us

This document was printed on recycled paper.

# DWI RECIDIVISM IN TEXAS, 1987-1990

I.     DWI RECIDIVISM IN TEXAS, 1987-1990
        1.1 Introduction ................................................................................... 1
        1.2 DWI Recidivism 1987-1990: Summary ........................................ 2

II.     BACKGROUND
        2.1 The BAC Limit, Alcohol Use, and High-Risk Driving ................... 5
        2.2 Implied Consent ............................................................................ 5
        2.3 Sentencing for DWI: Direct Conviction and Probation ................. 6
        2.4 DWI Education: An Established Program ....................................... 6
        2.5 DWI Intervention: A New Initiative .............................................. 6

III.     DATA AND METHODOLOGY
        3.1 Texas Driving Records .................................................................. 7
        3.2 Methodology ................................................................................. 7

IV.     RESULTS
        4.1 Trends in DWI Arrests and Alcohol Consumption ........................ 9
        4.2 DWI Offenders by Year ............................................................... 10
           4.2.1 Recidivism Measurement ..................................................... 11
           4.2.2 Multiple DWI Offenders ...................................................... 12
        4.3 DWI Education Program ............................................................... 13
           4.3.1 DWI Education and Recidivism ............................................ 13
           4.3.2 Effect of DWI Education on Recidivism ............................... 14
        4.4 Blood/Breath Test Refusals ......................................................... 17
        4.5 Demographic Characteristics ....................................................... 18
           4.5.1 Age ...................................................................................... 18
           4.5.2 Gender ................................................................................. 20
        4.6 Regional Differences .................................................................... 21
        4.7 Historical Factors ......................................................................... 23
           4.7.1 Prior Moving Violations ....................................................... 23
           4.7.2 License Suspension .............................................................. 23
           4.7.3 Accident Involvement .......................................................... 24

V.     CONCLUSION .................................................................................. 25

REFERENCES ............................................................................................ 27

Appendix A: BAC Chart
Appendix B: Texas County Listings and Regional Information

# I. DWI RECIDIVISM IN TEXAS, 1987–1990

## 1.1 INTRODUCTION

Drunk driving continues to be one of the state's most serious public health and safety problems. In 1991 in Texas, about 41 percent of fatalities and 13 percent of non-fatal injuries in motor vehicle accidents involved alcohol, and alcohol-related traffic crashes killed 1,248 people and injured an additional 33,786 (TCADA 1992). Alcohol-related motor vehicle accidents in 1989 resulted in an estimated 50,000 potential years of life lost due to premature mortality (Liu 1992).

About 1 out of 100 Texas licensed drivers is arrested for DWI (Driving While Intoxicated) in a given year, if one ignores the duplication of repeat offenders; but these repeat offenders, or recidivists, contribute significantly to the overall DWI problem and must be specifically addressed when discussing DWI prevention. Repeat DWI offenders have increasingly contributed to the workload of the DWI countermeasure system. Repeat DWI offenders ensure a never-ending supply of arrestees, overcrowd county court dockets, and fill county jails. Fewer repeat offenders would mean that efforts could be redirected to discouraging DWI in the general population, and ultimately to reducing accident rates.

The purpose of this study, which is second in a series, is to measure the DWI recidivism rates and to reveal what circumstances and factors affect DWI rearrest. Survival analysis is employed to compare the recidivism patterns among different groups. Various attributes that are associated with DWI recidivism are studied as well, such as DWI Education program attendance and completion, blood/breath test refusals, age, gender, prior non-DWI moving violations, license suspension, and regional differences. The analysis is based on examination of driver history note records of about 400,000 Texans arrested for DWI between 1987 and 1990. The data from Texas Department of Public Safety were processed by the DWI Recidivism Tracking System (DWIRTS), an automated driving record interpretation system. The DWIRTS combines information from Texas driver history records as well as other sources, such as automobile accident data, to create a plentifully detailed database supporting in-depth exploration of DWI behavior in Texas. The study's outcomes can be expected to impact policy decisions regarding drinking drivers and DWI recidivism prevention.

The last year used for the research period in the current study was 1990. This end-date provides a sufficient length of time for follow-up analysis and for the dataset to become mature and complete. In other words, the chosen end-date allows for most of the relevant data pertaining to a DWI event to occur and be recorded. For a person to be arrested for DWI, sentenced, assigned to a DWI class, and to complete the class takes time, and for all that data to be input into and read by a data system takes even longer. Using a four-year followup period produces a sufficiently robust dataset to fully analyze recidivism behavior over time.

In 1991, TCADA published the results of its analysis of DWI recidivism based on driving records for the years 1985 to 1988. Based on the study, the Legislature in 1991 (in House Bill 1, the General Appropriations Act) adopted as one of TCADA's key performance targets the measure "percent of DWI offenders completing DWI Education who were rearrested for DWI." For 1985–1988, the number was 5 percent. The current study found that for the years 1987–1990, the recidivism rate remained at 5 percent.

## 1.2 DWI RECIDIVISM 1987-1990: SUMMARY

### General Results

• DWI arrests declined by 21 percent between 1985 and 1989, and then increased slightly in 1990; this overall trend corresponds closely to the trend in per capita alcohol consumption during the same period.

• DWI arrests of *first offenders* declined by about 10 percent between 1987 and 1989 (from 60,138 to 54,376) and then increased to 56,445 in 1990.

• DWI arrests of *repeat offenders* increased by about 15 percent between 1987 and 1990 (from 29,768 to 34,219), which suggests that a stable minority of Texans persisted in drinking and driving.

• The percent of DWI offenders who were recidivists increased from 33 percent in 1987 to 38 percent in 1990.

• The more times an individual has been arrested for DWI, the more likely it is he or she will be arrested again for DWI (Figure 1).

• DWI offenders are most likely to be rearrested within one year of their first DWI; risk of rearrest decreases rapidly in the second year, and more slowly in the third and fourth years following arrest. Thus, efforts to prevent future drinking and driving should begin as soon as possible after initial arrest, and continue through the second year following the offense.

### DWI Education on Recidivism

• DWI offenders who receive probation and complete the required DWI Education class are less likely to recidivate than those who are directly convicted: 5 percent of first offenders who complete the DWI Education class recidivate within one year of their initial arrest, compared to 11 percent of first offenders who receive direct conviction (Figure 2).

• Probated first offenders who do not complete the DWI Education class are more than twice as likely to recidivate than probated offenders who complete the class (13 percent versus 5 percent).

• The DWI Education class is less effective in preventing recidivism among multiple offenders than among first offenders: only 5 percent of first offenders who complete DWI Education class recidivate within one year compared to 9 percent of multiple offenders. Specialized DWI Intervention classes targeted to the multiple offender were first implemented in fiscal year 1990, so the data in this 1987–1990 report can not reflect the effect of this intervention initiative.

• The percent of DWI offenders who received probation/DWI education decreased slightly between 1987 and 1990.

**FIG.1 CUMULATIVE DWI RECIDIVISM RATE AT YEARS 1 AND 4 BY NUMBER OF PRIOR CONVICTIONS: TEXAS, 1987–1990**





FIG.2 CUMULATIVE DWI RECIDIVISM MEASURED AT ONE AND FOUR YEARS AFTER INITIAL ARREST: TEXAS FIRST OFFENDERS, 1987-1990

**Blood/Breath Test Refusals**

• Between 1987 and 1990, both first and repeat offenders became more likely to refuse blood/breath tests (Figure 3): the percentage of first offenders refusing rose from 21 percent to 26 percent, and the percent of third and subsequent offenders refusing rose from 42 percent to 53 percent.

• The probability of a blood/breath test refusal increases as the number of past DWI offenses increases: only 26 percent of 1990 first offenders refused the blood/breath test, compared to 42 percent of second offenders and 53 percent of offenders with three or more DWIs on their record.

• Those who refuse the blood/breath test are more likely to be arrested again for DWI than those who



FIG.3 PERCENT OF OFFENDERS WHO REFUSED THE BLOOD/BREATH TEST, BY NUMBER OF PREVIOUS DWIS: TEXAS, 1987-1990

consent to the test. Those who refuse the blood/breath test AND escape conviction for DWI are more likely to be rearrested than those who refuse the test but still get convicted for DWI.

### Demographic Correlates

• Some demographic characteristics are more strongly associated with DWI recidivism than others. Males are more likely to be rearrested than females, and younger persons are more likely to be rearrested than older persons.

• There is marked regional variation with respect to arrests for DWI: the Plains region had the highest DWI arrest rate of 92.4 per 10,000 adult population, compared to a rate of 62.2 per 10,000 adult population in the Dallas/Fort Worth region. In the 1985–1988 DWIRTS study, San Antonio had the highest rate (111.3 per 10,000).

### Historical Driving Record Correlates

• DWI offenders with a prior history of moving traffic violations are more likely to recidivate than offenders without prior moving violations: 20 percent of first offenders with three or more pre-DWI moving violations were rearrested within 2.5 years, compared to 14 percent of first offenders with no previous violations.

• DWI offenders driving on a suspended license are more likely to be rearrested than those with a valid license: within four years of initial DWI arrest, 29 percent of drivers with suspended licenses recidivated for a second DWI, compared to 17 percent of individuals with a valid license.

• DWI offenders who are involved in an accident are less likely to be rearrested than those not in an accident.

# II. BACKGROUND

## 2.1 THE BAC LIMIT, ALCOHOL USE, AND HIGH-RISK DRIVING

Alcohol is a major contributor in many driving fatalities, accidents, and injuries. Excessive alcohol use causes deterioration of driving performance and raises the risk of crashes. Texas law specifies that a person with a measured blood alcohol concentration (BAC) of 0.10 percent or over and operating a motor vehicle is considered to be legally intoxicated. People with measured BACs below 0.10 percent have also been convicted of DWI, but such cases are not normally prosecuted because of the difficulty in securing conviction.

The amount of alcohol a person must consume before becoming legally intoxicated, and the length of time that person remains legally intoxicated, varies with a number of factors including body weight, gender and health, but it is fairly described as a large quantity within a short period of time (a BAC table relating number of drinks to weight and time appears in Appendix A). For example, a 190-pound man in good health must drink the equivalent of six 12-ounce beers within one hour to achieve a BAC of 0.10 percent, which is achieved about 20 minutes after drinking the last beer. The body metabolizes about one drink per hour and the BAC level should return to the 0.08-0.09 percent range within an hour after drinking the sixth beer. The hypothetical subject would need to continue drinking beyond six beers to maintain a BAC which would support conviction for DWI under normal circumstances.

The relative risk of a motor vehicle accident increases exponentially as the BAC percentage of the driver increases: at BACs between .02–.04%, the chance of being in a fatal single-vehicle crash is almost one and one-half times greater than the sober level; at BACs .05–.09%, the risk rises to 11 times greater; at BACs .1–.14%, the risk is 48 times greater; and BACs over .15% increase the chance of fatal accident by over 360 times (Zodor 1989). Most people arrested for DWI in Texas who take blood/breath tests have BACs over .15%.

While it is possible for someone to be apprehended the first time he or she drives with a BAC of 0.10 percent or above, this eventuality is unlikely. Conservatively estimated, a person drives an average of two hundred times at a 0.10 percent BAC, or one hundred times at a 0.15 percent BAC, before being arrested for DWI (Beitel et al. 1975). Moreover, many more people drive while intoxicated than get convicted for DWI. An estimated 20 percent of adult Americans drive legally intoxicated each year, but only 5 percent are ever convicted of DWI in their entire driving career (Perrine 1990).

In the TCADA Adult Survey (TCADA 1988), of the 4,560 interviews administered to Texans aged 18 and over, about 44 percent reported having ever driven after drinking "too much" and roughly 5 percent recalled having been in trouble with the law because of DWI. During the school year before the 1990 TCADA School Survey, 12 percent of Texas secondary students drove a car after having a good bit to drink; about 29 percent of seniors drove drunk, and 8 percent of seniors did so four or more times (TCADA 1990). Clearly, drunk driving involves many Texans, both young and old.

## 2.2 IMPLIED CONSENT

Driving is a privilege rather than a right. When receiving a Texas driver's license, one implicitly agrees to submit to blood/breath alcohol concentration testing whenever requested by an authorized law enforcement officer. Refusing the test can result in a 90-day license suspension. The suspension is "administrative" in the sense that the action is taken by the Department of Public Safety rather than a judge in the context of a court of law.

Some attorneys discourage their clients from submitting to blood/breath testing because a BAC of 0.10 percent is by definition "legally intoxicated." When BAC is not in evidence, the prosecution must find other ways of demonstrating impairment beyond a reasonable doubt. For many, increased chances of dismissal/acquittal may be well worth the inconvenience of a brief license suspension. In addition, an Attorney General's opinion (#JM959) ruled that

the driver license suspensions can be probated when an individual refuses to test.

## 2.3 SENTENCING FOR DWI: DIRECT CONVICTION AND PROBATION

Texas judges have a great deal of latitude when imposing sentences for DWI. Texas law provides the following range of sentencing options for *direct conviction:*

Fines:
> First Offense: $100-2,000
> Second Offense: $300-2,000
> Third Offense: $500-2,000

License Loss:
> First Offense: 3-12 months
> Second Or More: 6-24 months

Jail:
> First Offense: 72 hours-2 years
> Second Offense:15 days-2 years
> Third Offense: 30 days - 2 years
> (or TDCJ, 60 days-5 years)

Judges have the option of sentencing offenders to up to two years of probation in lieu of direct conviction on the first offense. These probated offenders may avoid jail time and/or license suspension. However, they are required to pay a monthly fee for probation services and complete an approved DWI education course.

The Office of Court Administration does not provide detail on sentences given to DWI offenders. However, given the common practice of plea bargaining, it is likely that maximum penalties are rarely imposed. Also, because district and county courts handle numerous DWI cases, many jurisdictions may have evolved sentencing guidelines.

## 2.4 DWI EDUCATION: AN ESTABLISHED PROGRAM

Article 42.12, Section 13 (h), of the Code of Criminal Procedure provides that probated DWI offenders must attend and complete a certified DWI Education program. Failure to complete such a program within six months of convictions results in a 180-day administrative license suspension. DWI offenders receiving direct conviction are not required to attend the course.

Currently, the standardized DWI Education curriculum requires a minimum of 12 hours of classroom instruction. The program provides participants with information about the physiological and psychological effects of alcohol and other drugs on their driving abilities, and about chemical dependency. Also included are explanations of laws relating to impaired drivers, the meaning of the "implied consent" law, and discussions of penalties for subsequent offense. Probationers attending classes can discuss the attitudes underlying their impaired driving behavior, and are instructed as to how to change those attitudes to avoid future DWI behavior. The course also identifies those drivers who have serious problems with alcohol and/or drug use, and refers these drivers for further evaluation.

Certified DWI Education programs have been in operation in Texas since 1978, and have been available in all parts of the State since 1982. The program is administered by the Texas Commission on Alcohol and Drug Abuse.

## 2.5 DWI INTERVENTION: A NEW INITIATIVE

Article 42.12, Section 13 (j), of the Code of Criminal Procedure establishes the DWI Intervention program as a statewide initiative specifically designed for repeat offenders. The 32-hour, standardized curriculum-based program focuses on life issues rather than basic educational information. The goal of the program is to have the offender recognize his or her substance-related behavior, accept that there is a problem, and seek help through recovery services. The DWI Intervention program addresses life style, values, self-esteem, positive thinking, irrational beliefs, responsibility, physiological/psychological effects of substance abuse, alcoholism and the chemical dependency process, effects of alcohol and other drugs on families, co-dependency, Alcoholics Anonymous, treatment options and 12-step self-help groups, stress and coping, relapse prevention, problem solving and action planning. Although relatively new, the program has been implemented in 23 sites throughout Texas. Implementation is on-going.

# III. DATA AND METHODOLOGY

## 3.1 TEXAS DRIVING RECORDS

Current core data for the DWI Recidivism Tracking System (DWIRTS) come from the Texas Department of Public Safety. The computer tape files extracted from the Driver's License History File and the Driver's License Basic File, a combined total of 4.2 million driver license and history note records for 402,000 drivers, are provided for analysis. Drivers without DWI-related notes, deceased drivers, and license-expired drivers were removed, reducing the file to basic license and driver history information for 385,000 drivers. The report sample is further limited to those records with a DWI dating between January 1, 1987, and December 31, 1990. A total of 352,372 DWI events for 301,445 drivers were generated for the time period 1987-1990.

The Texas Department of Public Safety maintains the driving records of all persons licensed to operate motor vehicles in the state. Courts and traffic adjudication agencies are required to report all traffic-related convictions to the department. The department uses the Driver Improvement and Control (DIC) system to classify driver history notes. A "DWI event" is defined as a summary of driver history notes including at least one note falling into the following classifications: a DWI-related conviction or probation (Class 3), a DWI-related enforcement or administrative action (Class 2), and a DWI-related traffic violation or accident (Class 1). Enforcement or administrative actions include license suspensions and reinstatements, revocations, blood/breath tests, and mandatory attendance at special DWI courses. DWI-related violations or accidents include a subset of all violation/accident types that strongly implies DWI behavior, such as weaving among traffic lanes and colliding negligently with a parked vehicle.

In this DWIRTS study, a DWI is defined as a Class 3 or Class 2 DWI event; Class 1 events are only considered DWIs when coupled with a Class 3 or Class 2 event. DWI repeat offenders, also called DWI recidivists, are drivers having two or more Class 3 or Class 2 events. Among the study sample

of 301,445 drivers, 63 percent (188,401 drivers) had only one DWI and 37 percent (113,044 drivers) had two or more DWIs. About 89 percent were male drivers, 8 percent had their auto insurance cancelled, and 2 percent received a habitual violator petition (given to those incurring at least four moving violations within one year, or seven moving violations within two years).

The 301,445 drivers incurred 352,372 DWI events between 1987-1990. One simple way to value the completeness of the DWIRTS data used in this study is to compare the DWIRTS-derived numbers to the actual number of DWI convictions adjudicated by county-level courts in Texas. Since DWI arrests are usually not adjudicated for a few months and the Texas Judicial System annual reports are in fiscal rather than in calendar years, it is hard to determine the exact number of cases initiating from 1987 through 1990 DWI arrests that were actually adjudicated. Assuming the average length of time to adjudicate a DWI is three months, the total number of cases of DWI convictions adjudicated by county-level courts would be estimated at 341,804 (derived by adding 42 percent of fiscal 1987 convictions, all fiscal 1988-1990 convictions, and 58 percent of fiscal 1991 convictions resulting from arrests which took place in calendar 1987 through 1990). This number is only 3 percent different from the 352,372 convictions detected by DWIRTS. Therefore, the DWIRTS data accurately reflects the number of DWIs on the driving record system and the recidivism estimations given in this report do not significantly under- or over-represent the actual statewide recidivism rates in Texas.

## 3.2 METHODOLOGY

SAS computer programming in a CMS mainframe was used to process the large DWIRTS dataset. The program examined the driver history notes, grouped notes into DWI events, assigned each note a common event sequence number, and summarized important information for each DWI event. Based on individual notes, the DWI event contains such infor-

mation as the driver age and years of driving experience at the time of the event, whether or not the driver was assigned to (and completed) a DWI Education class, and whether or not the event resulted in a license suspension. For use in recidivism analysis, it is important to include the computed "number of days to the next DWI" in the event information.

The DWI offenders were followed beginning the date of initial arrest until the date of rearrest or until the censor date. In order to capture the complete driving records, the censor date (December 1, 1991) was five months prior to the computer tape generated date. There is a small difference in the censor date computation between the current study and the previous 1985-1988 study (Fredlund 1991). Compared to the previous report, the length of time between the tape generated date and the censor date in this report is about three months longer.

The last year used for the research period in the current study was 1990. This end-date provides a sufficient length of time for follow-up analysis and for the dataset to become mature and complete. In other words, the chosen end-date allows for most of the relevant data pertaining to a DWI event to occur and be recorded. Using a four-year followup period produces a sufficiently robust dataset to fully analyze recidivism behavior over time.

Survival time analysis is employed in exploring the DWI recidivism rates by different factors over time. This method allows researchers to follow a group of offenders convicted at a given time and document those who recidivate at least once over a certain observation period. From a statistical point of view, the length of time until recidivism is a survival time. Instead of using the term "survival," this study reports "recidivism" (or "failure") rate, which can be computed as [1 - the survival rate]. The recidivism rate is actually the percentage of offenders who have become recidivists within a constant period of time.

The survival analyses are performed using the life table estimates in the SAS Lifetest Procedure. The life table estimates are computed by counting the censored observations as well as the uncensored observations. The cumulative distribution function of the failure time which is estimated at the beginning of the interval is used for the measurement of cumulative recidivism rates. The hazard rate, which is for the measurement of daily risk (or probability)

of rearrest, is estimated at the midpoint of the interval. All differences identified herein are statistically significant.

# IV. RESULTS

## 4.1 TRENDS IN DWI ARRESTS AND ALCOHOL CONSUMPTION

According to Uniform Crime Reports from the Department of Public Safety, there were a total of 433,537 DWI arrests made by State and local law enforcement authorities between 1987 and 1990. More people are arrested for DWI than other reported criminal offense: of all Texas adults (17 years and over) arrested in 1987-1990, approximately 14 percent were for DWI compared to 11 percent for larceny theft and 8 percent for drug abuse violations. The estimated costs of the publicly financed criminal justice system for DWI arrests were about $60 million in 1989 (Liu 1992).

Table 1 shows DWI arrest data from the Texas Department of Public Safety. The total DWI arrests decreased 21.4 percent between 1985 and 1989 (from 131,043 to 103,008), and then increased slightly in 1990. Males are much more likely to be arrested for DWI than females (91 percent versus 9 percent). Drivers under 35 years of age are at higher risk of being arrested for DWI than drivers 35 and older.

Almost two-thirds of the DWI arrests are of persons aged 17-34, compared to just over one-third of drivers who are 35 and over. The data indicates that males aged 17-34 are at highest risk of DWI, and implies that DWI prevention efforts should be directed to this group.

It is possible that public awareness and the DWI Education program resulted in the overall decrease in DWI arrests between 1987–1990. Another possible factor in the decrease is the reduction of per capita alcohol consumption during that same time period. Figure 4 indicates that per capita alcohol consumption decreased from 3.0 gallons of ethanol per person in 1985 to 2.4 gallons of ethanol per person in 1989, then slightly increased to 2.5 gallons in 1990 (estimation of ethanol contents are 0.045 for beer, 0.09 for ale, 0.129 for wine, and 0.414 for whiskey). This trend of per capita alcohol consumption is consistent with the DWI arrest trend in Texas, and implies that alcohol consumption can be an important factor in the decrease of DWI arrests (as opposed to changes in law enforcement efforts).

### TABLE 1: DWI ARRESTS BY AGE AND SEX: TEXAS, 1985-1990

| | Number of DWI Arrests | | | | | |
| | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|---|---|
| **Total** | 131,043 | 121,491 | 114,245 | 103,482 | 103,008 | 112,802 |
| **Males** | 120,272 | 111,036 | 104,150 | 93,867 | 93,091 | 101,617 |
| <17 | 342 | 358 | 308 | 259 | 227 | 215 |
| 17-34 | 79,354 | 73,673 | 67,019 | 60,138 | 58,579 | 64,286 |
| 35+ | 40,576 | 37,005 | 36,823 | 33,470 | 34,285 | 37,116 |
| **Females** | 10,771 | 10,455 | 10,095 | 9,615 | 9,917 | 11,185 |
| <17 | 52 | 60 | 30 | 31 | 16 | 28 |
| 17-34 | 7,158 | 6,809 | 6,665 | 6,203 | 6,382 | 7,118 |
| 35+ | 3,561 | 3,586 | 3,400 | 3,381 | 3,519 | 4,039 |

Source: Crime in Texas, Uniform Crime Reporting, Texas Department of Public Safety, 1985 - 1990.



**FIG.4  ALCOHOL CONSUMPTION (GALLONS PER TEXAS ADULT 13+) AND DWI ARRESTS IN TEXAS, 1985-1990**

## 4.2 DWI OFFENDERS BY YEAR

During the four-year study period, there were a total of 352,372 DWI offenders in Texas (226,431 first offenders and 125,941 repeat offenders). The pattern of first and repeat DWI offenders in Figure 5 seems to confirm the relationship between DWI arrest and alcohol consumption mentioned above. The number of DWI first offenders in Texas decreased by 10 percent between 1987 and 1989 (from 60,138 to 54,376), and then increased to 56,445 in 1990. The initial decline and subsequent increase in first DWI offenders between 1987 and 1990 were consistent with the trends of all DWI arrests in Texas shown in Table 1.

**FIG.5  NUMBER OF FIRST AND REPEAT DWI OFFENDERS IN TEXAS, 1987-1990**





**FIG.6 CUMULATIVE DWI RECIDIVISM: TEXAS FIRST OFFENDERS, 1987-1990**

*22% of first offenders were rearrested within 4 yrs*

*13% of first offenders were rearrested within 2 yrs*

*7% of first offenders were rearrested within 1 yr*

*Second DWI Occurred Within __ Days*

Repeat DWI offenders, on the other hand, increased modestly from 29,768 in 1987 to 34,219 in 1990. Repeat DWI offenders grew as a proportion of all DWI offenders from 33 percent in 1987 to 38 percent in 1990. This information implies that a relatively enduring minority of Texans persist in drinking and driving. State policy regarding the DWI countermeasures system should continue to focus on the implementation of DWI intervention programs to reduce recidivism among multiple offenders.

### 4.2.1 Recidivism Measurement

Recidivism, or the tendency to relapse to a previous stage of behavior, is the most frequent method used to evaluate countermeasure programs and effectiveness. The current study measures DWI recidivism—that is, the number of people re-arrested for DWI—and the data are based on DWIRTS-processed driving records in Texas. The follow-up time of recidivism is computed starting from the date of a DWI event to the date of the next DWI event (if recidivism occurs), or to the censor date of the study (if recidivism does not occur). The follow-up time can be an arbitrary figure. For example, a "four-year recidivism rate" is the percentage of DWI offenders who

get arrested again for DWI within four years of a prior DWI.

*Cumulative Recidivism Rates*: Figure 6 is a graphic representation of the combined recidivism rate of 226,431 individuals with a first DWI offense between 1987 and 1990. The figure's horizontal axis represents the number of days from the initial arrest to rearrest, and the vertical axis is the cumulative percentage of recidivism of first offenders. Through time, an increasing proportion of the original group of individuals recidivated. About 7 percent of first DWI offenders were rearrested within one year, 13 percent were rearrested within two years, and 22 percent were rearrested within four years of initial arrest.

*Daily Risk of Recidivism*: The measurement of daily probability of rearrest demonstrates the daily changes of DWI recidivism and can indicate which period of days (or years) would be the most critical time for DWI recidivism prevention. Figure 7 presents the daily risk of recidivism for Texas first DWI offenders during 1987-1990. For example, on day 45 after initial arrest, the daily probability of rearrest for a second DWI was 0.00022, which means about 22 per 100,000 first offenders were rearrested exactly 45 days following initial arrest. At the end of the follow-up time (day 1395), the probability of rearrest



**FIG.7 CHANGING DAILY RISK OF RECIDIVISM THROUGH TIME: TEXAS FIRST OFFENDERS, 1987-1990**

decreased to 13 per 100,000 first offenders. First offenders were most likely to recidivate for a second DWI during year one; therefore, the first year following initial arrest is the most important period for DWI recidivism prevention among first offenders.

### 4.2.2 Multiple DWI Offenders

The more times a person has been convicted of DWI, the more likely future recidivism will be. Figure 8 shows the cumulative DWI recidivism rates for three different groups of offenders. In the 1987-1990



**FIG.8 CUMULATIVE DWI RECIDIVISM BY NUMBER OF PRIOR CONVICTIONS: TEXAS, 1987-1990**



period, there were in total 226,431 DWI offenders arrested for the first time, 78,056 arrested for the second time, and 47,885 arrested for the third and subsequent time. The overall recidivism rates of first offenders are much lower than those of multiple offenders. Within four years, about 39 percent of third and subsequent offenders were rearrested for DWI, compared to 31 percent for second offenders and 22 percent for first offenders. The more prior DWI convictions, the higher recidivism rate becomes. Thus, intervention early in DWI careers could expect to gain significant results in recidivism reduction. For each 100 second offenses prevented, one also prevents an estimated 39 third and subsequent offenses in future years.

## 4.3 DWI EDUCATION PROGRAM

### 4.3.1 DWI Education and Recidivism

The notation of driver alcohol education programs on the driving records is an important indicator of a DWI offense. Between 1987 and 1990, 58 percent (204,585) of the total DWI offenders in Texas were assigned to probation and the DWI Education course taught either by local probation officers or private instructors. A total of 54,960 offenders arrested for DWI in 1987 were assigned to the probation/DWI

education sanction; 50,022 offenders arrested in 1988, 49,005 offenders arrested in 1989, and 50,598 offenders arrested in 1990 were assigned. The trend of decreasing offenders assigned to probation/DWI education between 1987 and 1989, and the slight increase in 1990, corresponds to the trend of number of DWI arrests.

Among the DWI offenders assigned to the education class, 82 percent (168,090) were first offenders and 18 percent (36,495) were repeat offenders. The courts assigned about three out of four first offenders to a DWI Education program, compared to less than one out of three repeat offenders (since the DWI Intervention program designed specifically for repeat offenders was only begun in is fiscal year 1990, no statistics are yet available for that separate curriculum). Toward the end of the 1987-1990 period, the courts tended less often to assign offenders to the DWI Education class. Figure 9 shows the declining percentages of DWI offenders receiving the probation/DWI education sanction from 1987 through 1990. The percentage decreased from 76 percent to 73 percent among first DWI offenders, 36 percent to 35 percent among second DWI offenders, and 19 percent to 17 percent among third and subsequent DWI offenders. Part of the reason is that more offenders are opting for direct conviction instead of probation.



**FIG.10   RISK OF REARREST FOR SECOND DWI,
PROBATION/EDUCATION VERSUS DIRECT CONVICTION: TEXAS
FIRST OFFENDERS, 1987-1990**

Increasing the level of participation in DWI education programs would be valuable in reducing alcohol-impaired driving. Offenders who are probated and assigned to the DWI Education program are less likely to recidivate within one year than those who are directly convicted and receive no DWI education. Figure 10 presents the daily probability of rearrest for second DWI between two groups (probation/education versus direct conviction) of first offenders. Among the first DWI offenders arrested between 1987 and 1990 in Texas, 168,090 received the probation/DWI education sanction and 58,341 received direct conviction. It is estimated that at 45 days after initial arrest, about 16 per 100,000 offenders assigned to the DWI Education course were rearrested for another DWI, compared to 38 per 100,000 offenders who received direct conviction. The gap between the two daily probability curves narrowed down significantly at 585 days after the initial arrest and stayed small through the rest of the follow-up time.

Throughout the first 585 days (or 1.5 years) following initial arrest, the risk of rearrest for first offenders receiving direct conviction was about two times higher than for those assigned to the education class. The difference could be from differences in treatment (for example, direct conviction versus probation/education) or from differences between the groups themselves (for example, those more likely to recidivate received direct conviction). Since this study is not based on random assignment to experimental groups, this question cannot be rigorously answered. However, the results do have face-validity indicating that the different rearrest rates are from differences in treatment. The normal probation length for a DWI conviction is 1 to 2 years, which corresponds to the 1.5 years during which probated offenders have significantly lower daily rearrest rates. Although the daily rearrest rates remained slightly higher among offenders receiving direct conviction after 1.5 years of initial arrest, the rates became quite similar for both groups. This suggests that increased participation in DWI Education class by DWI offenders would help prevent continued drinking and driving and reduce the incidence of rearrest for DWI.

### 4.3.2 Effect of DWI Education on Recidivism

Among those probated and assigned to DWI Education class during 1987-1990 in Texas, 15 percent of first DWI offenders and 24 percent of repeat DWI offenders failed to complete the course. Offenders who completed the DWI education were less likely



Day of Rearrest

to be rearrested for DWI than those who did not complete the class. Figure 11 illustrates the daily probability of rearrest for second DWI between the two groups (143,168 education-completed versus 24,922 non-completers) of first offenders. At 45 days after initial offense, about 12 per 100,000 first offenders who completed the DWI Education class recidivated for second DWI, compared to 41 per 100,000 offenders who did not complete the course. In other words, the class non-completers were more than three times as likely as the class completers to be arrested again for DWI on day 45. After 675 days (or 1.8 years) of initial arrest, the difference between the daily rearrest rates of class completers and non-completers became narrower and remained small through the rest of the follow-up.

During the two years after initial offense, DWI Education class completers had a much lower daily rearrest rate than those non-completers. The difference could be attributable to the course completion or to differences between the groups themselves. However, the daily rearrest rates of both groups after two years of initial offense are roughly equivalent, which suggests underlying similarity between groups with respect to recidivism. Thus, the DWI Education class could have a positive impact on reducing recidivism among course completers.

Of the total first DWI offenders between 1987 and 1990 in Texas, 63 percent (143,168) were probated and completed the DWI Education class, 26 percent (58,341) received direct conviction, and 11 percent (24,922) were probated but did not complete the class. The cumulative recidivism rates among these three groups of first offenders are shown in Figure 12. Within one year (360 days) of initial arrest, only 5 percent of the probated offenders who completed the class were rearrested for second DWI, compared to 11 percent of those receiving direct conviction, and 13 percent of the probated non-completers. First offenders who did not complete the education class are about two and half times more likely to recidivate within one year than those class completers, and slightly more likely to recidivate within a year than those directly convicted. At the end of a four-year period (1440 days), a total of 19 percent of probated education completers had been rearrested for second DWI, compared to 27 percent of those who were directly convicted, and 30 percent of probated education non-completers.

For multiple DWI offenders, completion of the DWI Education class also results in lower recidivism rates than non-completion of the class. The offenders whose third DWI arrest occurred during the period of 1987-1990 were chosen for the following recidivism



*Second DWI Occurred Within __ Days*

analysis. Of the total third DWI offenders, 22,741 received direct conviction, 4,521 were probated and completed the education class, and 1,618 were probated but did not complete the class. As shown in Figure 13, third offenders who completed the education class had the lowest recidivism rate of 9 percent within one year, followed by those receiving direct conviction (13 percent) and the class non-completers (17 percent). Within four years, the cumulative recidivism rate for next (fourth) DWI would be 30 percent for education course completers, 37 percent for direct convictees, and 40 percent for education course non-completers. As with first offenders, probated third offenders not completing the education

FIG.13   CUMULATIVE DWI RECIDIVISM BY EDUCATION CLASS
COMPLETION STATUS: TEXAS THIRD OFFENDERS, 1987-1990



*Next DWI Occurred Within __ Days*

class recidivated at a much higher rate than those completing the course.

Figure 12 and Figure 13 illustrate that third DWI offenders exhibit a much higher recidivism rate than first DWI offenders. Repeat DWI offenders do not respond as well as first DWI offenders to the DWI Education program, according to these recidivism measurements. A more intensive DWI intervention effort has been designed and implemented for these multiple offenders; as of October 1992, there were 23 DWI multiple offender programs in operation in Texas. Future studies would be able to show comparative recidivism rates for repeat offenders completing the intervention program.

Comparison of the current and previous DWIRTS study (Fredlund 1991) estimates shows that there has not been much change in recidivism rates among the three groups of DWI offenders (class completers, class non-completers, and those directly convicted). For example, the four-year cumulative recidivism rates for first DWI offenders in the current 1987-1990 study are only slightly higher than those in the previous 1985-1988 study (17 percent of class completers, 26 percent of non-completers, and 24 percent of direct convictees recidivated by year four in the first study, compared to 19 percent, 30 percent, and 27 percent in the current study).

## 4.4 BLOOD/BREATH TEST REFUSALS

Any person who drives on the public beach or highways of Texas has implicitly given consent to a chemical breath or blood test to determine the blood alcohol content if suspected of DWI. If the driver refuses the test, the Department of Public Safety can file a proceeding to suspend one's license for 90 days.

The percentage of Texas drivers refusing to take a blood/breath test (B/BT) increased as the number of their DWIs increased. About twice the proportion of repeat DWI offenders than first offenders refused the B/BT in Texas during 1987-1990 (Figure 14): in 1990, 53 percent of third and subsequent offenders refused the B/BT compared to only 26 percent of first offenders. The percentage of first offenders refusing the B/BT grew slightly toward the end of the 1987-1990 period, yet repeat DWI drivers still refused the B/BT more frequently. Some possibilities regarding the upward trend of B/BT refusals include the following: B/BT refusal license suspensions can be appealed to justice of the peace court where they are sometimes probated; many drivers with a suspended license can get an occupational license which allows them to drive to and from work; even when a license remains fully suspended, chances of getting



FIG.14   PERCENT OF BLOOD/BREATH TEST REFUSALS BY NUMBER OF PREVIOUS DWI CONVICTIONS: TEXAS, 1987-1990



**FIG.15 CUMULATIVE DWI RECIDIVISM BY BLOOD/BREATH TEST AND CONVICTION STATUS: TEXAS FIRST OFFENDERS, 1987-1990**

*Second DWI Occurred Within __ Days*

apprehended are minimal; even if apprehended, the violation results only in a fine; and chances of dismissal or acquittal of the DWI charge are better if BAC evidence derived from the B/BT is not available to the prosecution.

Of the total 226,431 first DWI offenders during 1987-1990, about 76 percent took the B/BT and received DWI convictions, 15 percent refused the B/BT but still received DWI convictions, 9 percent refused the B/BT and were not convicted of DWI, and only 1 percent took the B/BT and avoided DWI conviction. Figure 15 illustrates the recidivism rates of these four groups of first offenders. Offenders who refused the B/BT had much higher recidivism rates than those taking the B/BT. Among B/BT refusers, drivers not convicted of DWI were more likely to be rearrested than those convicted of DWI. Four years after the initial arrest, 27 percent of B/BT refusers not convicted of DWI had been rearrested, compared to 25 percent of convicted refusers, 21 percent of those who took the B/BT and were convicted of DWI, and 13 percent of those who submitted to the test but were not convicted.

Similar DWI recidivism rates based on blood/breath test refusals were found in the first DWIRTS study (Fredlund 1991): 26 percent of blood/breath test refusers not convicted of DWI were rearrested

within four years, compared to 23 percent for convicted refusers and 19 percent for those who took the blood/breath test and were convicted of DWI. Though the recidivism rates were slightly lower in the first study, both studies confirm the same message: blood/breath test refusers are more likely to be arrested again for DWI than those who consent to the test, and those who refuse the blood/breath test AND avoid conviction for DWI are more likely to be rearrested than those who refuse the test and get convicted.

## 4.5 DEMOGRAPHIC CHARACTERISTICS

Research has found that age and gender are important factors attributed to DWI recidivism (Donovan *et al.* 1983). Younger DWI offenders are more likely to recidivate than older ones. Males are more likely to be rearrested for DWI than females. Therefore, changes in the age and sex distribution of drivers can consequently alter recidivism rates.

### 4.5.1 Age

A large proportion of alcohol-related accidents and DWI arrests involves youthful drivers. Figure 16 shows the ratio of first-time DWI arrests to total population by age group. Approximately 195,000

drivers aged 18-44 were arrested for a first DWI between 1987 and 1990. Every year in Texas about 1 out of 100 people 18-25 years of age are arrested for their first DWI. The arrest rate in the 18-25 age group is significantly higher than any other age group. One reason may be that persons aged 18-25 consume more alcohol on average than other age groups (TCADA 1988). In addition, their general driving inexperience and impetuousness may result in greater risk of DWI arrest (Donovan *et al.* 1983). Young drunk drivers can behave differently from older drunk drivers, and this may influence youth DWI detection and arrest.

Drivers with repeat DWI arrests tend to be slightly older than first offenders. Among the DWI first offenders in Texas during 1987-1990, 30 percent were 18-25 years old and 56 percent were 26-44. In contrast, less than one in five repeat DWI offenders were under age 25, while almost two out of three repeat DWI offenders were 26-44 years old.

Younger drivers are more likely to be rearrested for DWI than older drivers. Four years after the time of first DWI arrest, about 25 percent of the 18-25 age group and 23 percent of the 26-34 age group had been rearrested, compared to 17 percent of the 45-64 age group, and 12 percent of the 65 and over age group (Figure 17). In Texas, a first time DWI offender aged 18-25 has about 50 percent greater

chance of recidivism than a Texan 65 years of age or older. The first DWIRTS study (Fredlund 1991) showed similar patterns of recidivism by age group for first DWI offenders.

### 4.5.2 Gender

The great majority (87 percent) of first-time DWI offenders during 1987-1990 were male, making DWI a gender-specific event. The driving records in Texas during 1987-1990 indicate that only 10 percent of all DWI offenders are female (13 percent of first offenders and 6 percent of repeat offenders). Male repeat offenders increased from 35 percent to 40 percent of all male DWIs, and female repeat offenses grew from 19 percent to 22 percent of all female DWIs between 1987 and 1990. These data again reflect a relative increase in DWI recidivism.

Male first offenders are also more likely to be rearrested for DWI than female first offenders. Figure 18 shows significant differences in the cumulative DWI recidivism rates for the two gender groups. The cumulative rearrest rate within two years is 14 percent for males and 9 percent for females; after four years, those rates are 23 percent and 15 percent, respectively. One possibility for the differences in recidivism is that more drinking men than drinking women may be driving, resulting in a greater poten-



**FIG.16   AGE AT FIRST DWI ARREST AS RATIO OF POPULATION: TEXAS, 1987-1990**



**FIG.17  CUMULATIVE DWI RECIDIVISM BY AGE GROUP: TEXAS FIRST OFFENDERS, 1987-1990**

Second DWI Occurred Within __ Days

Legend:
- Less than 18
- 18 to 25
- 26 to 34
- 35 to 44
- 45 to 64
- 65 and over

tial for DWI violations and arrests of males. Another suggestion is that the lifestyles and police attitudes of male offenders may differ from those of female offenders, which may make males more likely to recidivate (Yu *et al.* 1992).

Between the first DWIRTS study (1985–1988) (Fredlund 1991) and the present study (1987–1990),

the cumulative four-year recidivism rate increased slightly for both male first offenders (from 21 percent to 23 percent) and female first offenders (from 13 percent to 15 percent). Both studies show that male offenders are more likely to be arrested again for DWI than female offenders.



**FIG.18  CUMULATIVE DWI RECIDIVISM BY GENDER: TEXAS FIRST OFFENDERS, 1987-1990**

Second DWI Occurred Within __ Days

Legend:
- Males
- Females

## 4.6 REGIONAL DIFFERENCES

This section presents the estimate of incidence of DWI recidivism within specific regions and localities in Texas. There are noticeable regional differences in recidivism rates for Texas first DWI offenders. There are eight statewide regional groups of counties, which are consistent with the eight regions in the previous DWI recidivism study (Fredlund 1991) and are detailed in Appendix B. The two largest populated regions are in Dallas/Fort Worth and Houston areas, which cover more than 50 percent of the total adult Texas population aged 18 and over. To obtain the total four-year (1987-1990) Texas population by region, it was approximately estimated by multiplying the 1990 population in Appendix B by four.

The residence ZIP code in the DWIRTS was used to identify the driver's county of residence. About 1 percent of the sample individuals had an unmatched ZIP code. Table 2 exhibits the total number of DWI offenders and the DWIs per 10,000 adult population by region during 1987-1990. Over four years, the Houston region had the most first and repeat DWI offenders (86,401 or 25 percent), followed by the Dallas/Fort Worth region (77,174 or 22 percent) and the Plains region (46,648 or 13 percent). The Corpus Christi region reported the fewest DWI offenders (14,047 or 4 percent). Repeat DWIs as a proportion of each region's total DWIs ranged from 32 percent to 41 percent, with the Plains and East Texas the highest, and the San Antonio region the lowest.

In terms of DWIs per 10,000 adult population, the overall DWI arrest rate in Texas for the period of 1987-1990 was 72.5 per 10,000 adult population. The Plains region had the highest rate both in first (54.6 per 10,000) and repeat (37.8 per 10,000) offenses, leading to the overall rate of 92.4 per 10,000. The lowest rate was observed in the Dallas/Fort Worth region (overall 62.2 per 10,000). The variation in DWI arrest rates among regions can be caused by different local factors such as DWI enforcement practices, court/adjudication procedures, prevalence rate of alcoholism, urban-rural population distribution, and permission/prohibition of alcoholic beverage sales.

The overall four-year rate of DWIs per 10,000 adult population in the current study (72.5) is almost equivalent to the rate in the previous DWIRTS report (78.6) (Fredlund 1991). However, there were some notable differences between the two studies in the San Antonio data. In the first report, the San Antonio region had the highest rate (111.3 DWIs per 10,000 adult population), but its rate declined to 76.9 per 10,000 in the subsequent report. The difference primarily came from the different rates for first offenders (78.9 per 10,000 adult population in 1985-1988 versus 52.0 per 10,000 adult population in 1987-1990).

### TABLE 2: NUMBER OF DWIs BY REGION IN TEXAS, 1987-1990

| Region | Number of DWI Offenses | | | DWIs Per 10,000 Adult Population | | |
|--------|-------|--------|-------|-------|--------|---------|
| | First | Repeat | Total | First | Repeat | Overall |
| Plains | 27,556 | 19,092 | 46,648 | 54.6 | 37.8 | 92.4 |
| Border | 18,077 | 10,865 | 28,942 | 43.2 | 26.0 | 69.2 |
| Dallas/Fort Worth | 51,357 | 25,817 | 77,174 | 41.4 | 20.8 | 62.2 |
| East | 14,953 | 10,318 | 25,271 | 42.1 | 29.0 | 71.1 |
| Houston | 57,185 | 29,216 | 86,401 | 47.1 | 24.0 | 71.1 |
| Central | 24,216 | 13,676 | 37,892 | 47.0 | 26.5 | 73.5 |
| San Antonio | 21,974 | 10,531 | 32,505 | 52.0 | 24.9 | 76.9 |
| Corpus Christi | 8,811 | 5,236 | 14,047 | 47.2 | 28.1 | 75.3 |
| Unmatched Zips | 2,302 | 1,190 | 3,492 | N.A. | N.A. | N.A. |
| **Total** | **226,431** | **125,941** | **352,372** | **46.6** | **25.9** | **72.5** |



**FIG.19  CUMULATIVE FOUR-YEAR DWI RECIDIVISM BY REGION: TEXAS FIRST OFFENDERS, 1987-1990**

Figure 19 presents the regional cumulative recidivism rate within four years after the initial DWI offense. The percentage of first offenders rearrested for DWI varies among Texas regions and ranges from 20 percent (the Dallas/Fort Worth region) to 27 percent (the Plains region). The estimates of the recidivism rates for all regions are slightly higher in the 1987-1990 study than those in the previous 1985-1988 study. The recidivism range in the previous report was from 17 percent (the Dallas/Fort Worth region) to 23 percent (the Plains region), with a small difference in order.

**FIG.20  CUMULATIVE DWI RECIDIVISM BY NUMBER OF PREVIOUS MOVING TRAFFIC VIOLATIONS: 1989 FIRST OFFENDERS IN TEXAS**



## 4.7 HISTORICAL FACTORS

### 4.7.1 Prior Moving Violations

Non-DWI moving violations include speeding, running a red light, or any one of several hundred specific moving violations. Though moving violations are not direct indicators of DWI-related behavior, they are important since they may suggest a general tendency of disregarding established laws. DWI offenders with a prior history of moving traffic violations represent substantially higher accident risks than DWI offenders with "clean" records. The presence of pre-DWI moving violations becomes more evident as the number of DWIs increases.

Since citations for non-DWI moving violations are deleted from the driving record after five years, the recidivism analysis of previous moving violations is limited to the drivers who received their first DWI in calendar 1989. Among the 54,376 first DWI offenders, 29,949 (55 percent) had no prior moving violations, 17,665 (33 percent) had one or two prior moving violations, and 6,762 (12 percent) had three or more prior moving violations. Figure 20 shows that within 900 days (2.5 years), about 20 percent of first offenders with three or more pre-DWI moving violations were rearrested for DWI compared to 17 percent of those with one or two previous moving violations, and 14 percent of those with no prior moving violations. Individuals with higher numbers of prior non-DWI moving violations are more likely to be arrested again for DWI.

The cumulative rearrest rates by number of previous moving traffic violations are slightly higher for 1989 first offenders than those for 1987 first offenders in Texas. The previous DWIRTS study (Fredlund 1991) showed that among the 1987 first offenders with three or more pre-DWI moving violations, 17 percent were rearrested for DWI within 900 days, compared to 14 percent for offenders with one or two previous moving violations and 12 percent for drivers with no prior violations.

### 4.7.2 License Suspension

Alcohol-involved traffic accidents are about five times more likely to occur for drivers with suspended, revoked, or no driver's licenses than for drivers with valid licenses (DHHS 1990). The 1987-1990 driving records revealed that among Texas first DWI offenders, 41 percent (92,473 drivers) had their license suspended; 82 percent of repeat offenders had suspended licenses (licenses can be suspended for a variety of reasons related to the DWI



**FIG.21 CUMULATIVE DWI RECIDIVISM BY DRIVER'S LICENSE SUSPENSION: TEXAS FIRST OFFENDERS, 1987-1990**

*Second DWI Occurred Within __ Days*



**FIG.22 CUMULATIVE DWI RECIDIVISM BY ACCIDENT INVOLVEMENT, 1 TO 4 YEARS AFTER INITIAL ARREST: TEXAS FIRST OFFENDERS, 1987-1990**

event). Driver's license status appears to play an important role in DWI offenses and DWI recidivism.

The recidivism rates in Figure 21 show that DWI offenders driving on a suspended license are much more likely to be rearrested than those with a valid license. Within four years of the initial DWI arrest, about 29 percent of drivers with a suspended license recidivated for second DWI, compared to 17 percent of individuals with a valid license. The significant difference in recidivism between these two groups implies that driver's license suspension or revocation penalties are ineffective in preventing DWI-convicted chronic drinkers from driving while intoxicated.

### 4.7.3 Accident Involvement

Figure 22 shows the DWI recidivism rates by accident involvement within four years after the first arrest. The DWI offenders who were involved in an accident were slightly less likely to be rearrested than those not in an accident (6 percent versus 8 percent at the end of year one). One feasible explanation for this result is that more accident-involved offenders may have improved their drinking-and-driving behavior after the initial DWI arrest than

non-accident involved offenders. Booth and Grosswiler (1978) reported that former DWI clients who were in a car accident drank significantly less after treatment compared to non-accident involved clients. Whether or not an accident was involved at the time of the DWI arrest may have implications for future DWI recidivism risk, regardless of whether or not treatment was received.

# V. CONCLUSION

DWI is a complex phenomenon and many factors affect the DWI event. In this study, DWI recidivism rates have been compared among different variables such as status of DWI Education program, blood/breath testing acceptance or refusal, geographical classification, historical driving record, and demographic characteristics. The evidence shows that probated offenders assigned to DWI Education class are less likely to be arrested again for DWI than offenders receiving direct conviction and not assigned to the education class. Moreover, probated offenders who complete the DWI Education class are about one-half as likely to recidivate as probated offenders who do not complete the class.

DWI offenders who refuse the blood/breath test have much higher recidivism rates than those taking the blood/breath test, and the blood/breath test refusers who are not convicted are more likely to recidivate than those convicted. Males are more likely than females to combine drinking and driving, and to become repeat DWI offenders. Younger drivers are more likely to recidivate than older ones. Individuals with higher numbers of prior non-DWI moving violations are more likely to be rearrested. If an accident occurred as a result of the DWI incident, the rate of DWI recidivism is slightly lower. The percentage of first offenders rearrested for second DWI varies among Texas' eight regions, with four-year cumulative recidivism rates ranging from 20 percent to 27 percent.

Within one year, multiple DWI offenders are about two times as likely to recidivate as first DWI offenders. While the number of first offenders decreased in Texas between 1987 and 1990, the number of repeat offenders increased 15 percent. Repeat offenders are more likely to refuse the blood/breath test, to drive with a suspended or revoked license, and to fail to complete the DWI Education class.

Increasing the percentage of offenders who are probated to and subsequently complete the DWI Education and Intervention programs (and, if necessary, treatment) would reduce the frequency of DWI recidivism. Because completion of an assigned education class is clearly associated with lower recidivism during the first two years after initial arrest, first offenders need to attend the DWI classes early on. Repeat DWI offenders should be assigned to the DWI Intervention program, because future reduction in DWI recidivism depends on the effective utilization of programs and countermeasures that are specifically targeted to these habitual drinking drivers. This may be particularly important for youthful offenders, since DWI careers of multiple offenders tend to start at a young age. In addition, completion of the DWI Education or DWI Intervention program should be required for offenders receiving non-probated sentences for first and subsequent offenses.

To reduce overall risk of DWI recidivism, it may also be necessary to allow an officer to take possession of a suspected DWI offender's license when the driver refuses the blood/breath test, and to revoke the license for up to one year. This provision could discourage offenders from driving when at high risk of rearrest and encourage compliance with required blood/breath testing. In addition, requiring DWI offenders to complete a DWI Education or Intervention program prior to having their licenses reinstated might help reduce recidivism.

The findings of this study are quite consistent with those from the previous 1985-88 DWI recidivism study (Fredlund 1991). There are several possible reasons that the cumulative four-year recidivism rates estimated in this study are slightly higher than those estimated in the previous 1985-88 study. First, although per capita alcohol consumption has decreased, the prevalence of heavy drinking may have remained high and thus contributed to high rates of DWI recidivism. Second, the process for expediting court records may have improved, which results in more DWI events being tracked down prior to the censor date in the study. Third, the percent of all DWI offenders who are recidivists has increased, thus contributing to the increase of overall recidivism rates.

Further study is needed on the most intractable subpopulation of habitual drinking drivers. The DWIRTS study could benefit from additional information regarding jail sentence history, substance abuse history, and fines levied due to DWIs, which could have siginificant implications for policy deci-

sions regarding the drinking driver. Also, limited evidence suggests that some indirect policies may affect the rate of alcohol consumption and subsequent impaired driving, such as taxes on alcohol and restrictions on its availability. Further evaluation of these policies is needed.

# REFERENCES

Beerman, K. A., M. M. Smith, and R. L. Hall. "Predictors of Recidivism in DUIIs." *Journal of Studies on Alcohol* 49:3 (1988): 443-449.

Beitel, G. A., M. C. Sharp, and W. D. Glauz. "Probability of Arrest While Driving Under the Influence of Alcohol." *Journal of Studies on Alcohol* 36:1 (1975): 109-116.

Booth, R. E. and R. A. Grosswiler. "Correlates and Predictors of Recidivism Among Drinking Drivers." *The International Journal of the Addictions* 13:1 (1978): 79-88.

Donovan, D. M., G. A. Marlatt, and P. M. Salzberg. "Drinking Behavior, Personality Factors, and High-Risk Driving." *Journal of Studies on Alcohol* 44:3 (1983): 395-428.

Fredlund, E. V. *DWI Recidivism in Texas, 1985 Through 1988.* Austin, Texas: TCADA, May 1991.

Liu, L. Y. *Economic Costs of Alcohol and Drug Abuse in Texas: 1989.* Austin, Texas: TCADA, April 1992.

Maltz, M. *Recidivism.* Orlando, Florida: Academic Press, Inc., 1984.

Perrine, M. W. "Who Are the Drinking Drivers?" *Alcohol and Health Research World* 14 (1990): 26-35.

Randall, T. "Driving While Under Influence of Alcohol Remains Major Cause of Traffic Violence." *JAMA* 268:3 (July 15, 1992): 303-304.

Richman, A. "Human Risk Factors in Alcohol-Related Crashes." *Journal of Studies on Alcohol,* Supplement No. 10 (July 1985): 21-31.

Texas Commission on Alcohol and Drug Abuse. TCADA Adult Survey, conducted in conjunction with Texas A&M Public Policy Resources Laboratory (PPRL), Spring 1988; unpublished data.

_____. *1990 Texas School Survey of Substance Abuse.* Austin, Texas: TCADA, October 1990.

_____. *Current Substance Abuse Trends in Texas.* Austin, Texas: TCADA, May 1992.

U.S. Department of Health and Human Services. *Alcohol and Health: Seventh Special Report to the U.S. Congress.* Rockville, MD: DHHS, January 1990.

Yu, J., D. T. Essex, and W. R. Williford. "DWI/DWAI Offenders and Recidivism by Gender in the Eighties: A Changing Trend?" *The International Journal of the Addictions* 27:6 (1992): 637-647

Zodor, P. L. "Alcohol-Related Risk of Fatal Driver Injuries in Relation to Driver Age and Sex." *Insurance Institute of Highway Safety* (1989).

# Appendix A: BAC Chart

Not Available in electronic form. Contact the Commission for a copy of this chart.

# Appendix B: Texas County Information and Regional Listing

## Region 1, Plains

Andrews
Archer
Armstrong
Bailey
Baylor
Borden
Briscoe
Brown
Callahan
Carson
Castro
Childress
Clay
Cochran
Coke
Coleman
Collingsworth
Comanche
Concho
Cottle
Crane
Crockett
Crosby
Dallam
Deaf Smith
Dickens
Donely
Eastland
Ector
Fisher
Floyd
Foard
Gaines
Garza
Flasscock
Gray
Hale
Hall
Hansford
Hardeman
Hartley
Haskell
Hemphill
Hockley
Howard
Hutchinson
Irion
Jack
Jones
Kent
Kimble
King
Knox
Lamb
Lipscomb
Loving
Lubbock
Lynn
McCullough
Martin
Mason
Menard
Midland
Mitchell
Montague
Moore
Motley
Nolan
Ochiltree
Oldham
Parmer
Pecos
Potter
Randall
Reagan
Reeves
Roberts
Runnels
Schleicher
Scurry
Schackelford
Sherman
Stephens
Sterling
Stonewall
Sutton
Swisher
Taylor
Terrell
Terry
Throckmorton
Tom Green
Upton
Ward Wheeler
Wichita
Wilbarger
Winkler
Yoakum
Young

## Region2, Border

Brewster
Cameron
Culberson
Dimmit
Edwards
El Paso
Hidalgo
Hudspeth
Jeff Davis
Jim Hogg
Kinney
La Salle
Maverick
Presidio
Real Starr
Uvalde
Val Verde
Webb
Willacy
Zapata
Zavala

## Region 3, Dallas/Ft Worth

Collin
Cooke
Dallas
Denton
Ellis
Erath
Fannin
Grayson
Hood
Hunt
Johnson
Kaufman
Navarro
Palo Pinto
Parker
Rockwall
Somervell
Tarrant
Wise

## Region 4, East

Anderson
Angelina
Bowie
Camp
Cass
Cherokee
Delta
Franklin
Gregg
Harrison
Henderson
Hopkins
Houston
Jasper
Lamar
Marion
Morris
Nacogdoches
Sabine
San Augustine
San Jacinto
Shelby
Smith
Titus
Trinity
Tyler
Upshur
Van Zandt
Wood
Newton
Panola
Polk
Rains
Red River
Rusk

## Region 5, Houston

Austin
Brazoria
Chambers
Colorado
Fort Bend
Galveston
Hardin
Harris
Jefferson
Liberty
Matagorda
Montgomery
Orange
Walker
Waller
Wharton

## Region 6, Central

Bastrop
Bell
Blanco
Bosque
Brazos
Burleson
Burnet
Caldwell
Coryell
Falls
Fayette
Freestone
Grimes
Hamilton
Hays
Hill
Lampasas
Lee
Leon
Limestone
Llano
McLennan
Madison
Milam
Mills
Robertson
San Saba
Travis
Washington
Williamson

## Region 7, San Antonio

Atascosa
Bandera
Bexar
Comal
Frio
Gillespie
Guadalupe
Karnes
Kendall
Kerr
Medina
Wilson

## Region 8, Corpus Christi

Aransas
Bee
Brooks
Calhoun
DeWitt
Duval
Goliad
Gonzales
Jackson
Jim Wells
Kenedy
Kleberg
Lavaca
Live Oak
McMullen
Nueces
Refugio
San Patricio
Victoria

**TABLE B1: ADULT POPULATION BY REGION AND AGE GROUP IN TEXAS, 1990**

| Region | Total Adults | Aged 18-24 | Aged 25-34 | Aged 35+ |
|---|---|---|---|---|
| Plains | 1,262,401 | 185,380 | 282,725 | 794,296 |
| Border | 1,045,619 | 189,457 | 249,305 | 606,857 |
| Dallas/Fort Worth | 1,771,058 | 3,104,482 | 462,255 | 871,169 |
| East | 888,369 | 117,516 | 178,009 | 592,844 |
| Houston | 3,037,753 | 446,072 | 820,887 | 1,770,794 |
| Central | 1,288,570 | 262,432 | 322,016 | 704,122 |
| San Antonio | 1,057,024 | 162,891 | 255,510 | 638,623 |
| Corpus Christi | 295,062 | 466,453 | 64,841 | 106,550 |
| **Total** | **12,150,671** | **1,890,844** | **3,086,171** | **7,173,656** |

Source:     Texas 1990 Census of Population, U.S. Department of Commerce, Bureau of the

Census.

# Appendix 3



*TRAFFIC TECH*



People Saving People
www.nhtsa.dot.gov

Technology Transfer
Series

Number 85, February 1995

# REPEAT DWI OFFENDERS IN THE UNITED STATES

In 1992, more people were arrested in the U.S. for driving under the influence (DUI) or driving while intoxicated (DWI) than any other reported criminal offense. Over 1.6 million drivers were arrested for DUI or DWI compared to 1.5 million people arrested for larceny or theft and 1.1 million people for drug abuse violations. There is public concern that many of these drivers arrested each year for DWI are repeat offenders. There is also convincing evidence that repeat offenders as a group are high risk problem drinker drivers.

This *TRAFFIC TECH* discusses the extent of the repeat DWI offender problem in various states and some sanctions being used to reduce DWI recidivism. The National Highway Traffic Safety Administration (NHTSA) requested available information from all the states in order to define the extent of the repeat offender problem. Twelve states provided data. The results shown in Table 1 indicate that about one third of all drivers arrested or convicted of DWI each year are repeat DWI offenders. This proportion ranges from 21% of drivers convicted of DWI in Iowa in 1992 to 47% in New Mexico in 1990. The median is around 31% - 32% of arrests and/or convictions. One study in California showed that for every driver convicted of DUI in 1980, a full 44% were convicted again of DUI within 10 years.

Drivers with prior DWI convictions are also overrepresented in fatal crashes and have a greater relative risk of fatal crash involvement. One study showed that about 3 percent of all licensed drivers had a prior arrest for DWI within the past three years, yet 12 percent of intoxicated drivers involved in fatal crashes had at least one prior DWI conviction in the past three years. That same study showed that intoxicated drivers with prior DWI convictions had 4.1 times the risk of being in a fatal crash as intoxicated drivers without prior DWIs. Another study showed that fatal crash risk increases with the number of prior DWI arrests.

About a third of all drivers arrested for DWI are repeat offenders according to the data reported here, and 1 out of 8 intoxicated drivers in fatal crashes have had a prior DWI conviction within the past three years. While this indicates they are a significant problem, repeat offenders do not constitute the majority of the DWI problem in the U.S. Prevention of DWI in the first place and dealing effectively with first time DWI offenders is a rational approach to the problem. State laws, enforcement, and public information and education have recently been effective in reducing impaired driving and alcohol-related crash deaths.

However, evidence from the states indicates that many persons who are arrested and convicted of DWI continue to drink and drive. A number of states and local communities have initiated programs and sanctions to deal with repeat offenders, including:

- incarceration

- special DWI facilities

- house arrest with electronic monitoring

- victim restitution

- community service

- ignition interlock on the vehicle

- increased fines and insurance rates

- public condemnation

- license plate tagging

- vehicle impoundment or confiscation

Further research is needed to evaluate the effectiveness of these specific sanctions.

Given that the likelihood of arrest for DWI varies from 1 in 200 instances in some communities to 1 in 2,000 in others, it is important to prevent impaired driving in the first place. State legislation, such as administrative license revocation and lower blood alcohol limits for adults and youth, and increased enforcement in the form of sobriety checkpoints, have contributed to the recent reduction in drinking and driving. Greater public awareness of the problem and reductions in per capita alcohol consumption have also probably played a role.

Each year, however, 1 percent of all licensed drivers are arrested for DWI, more people than for any other crime. States must show drivers that DWI is a serious offense with correspondingly serious consequences in terms of sanctions and treatment. Mandatory alcohol problem assessment and assignment of appropriate treatment, in addition to sanctions, is a reasonable approach with help from the public health community. Certain vehicle actions applied to repeat offenders may also be appropriate. The fact that this information was readily available in only a few states underscores the importance of developing systems to track DWI offenders (e.g., systems that link criminal justice and driver records).

For more information about this topic, contact:

James Fell, Office of Alcohol and State Programs,
NHTSA, NTS-20,
400 Seventh Street, S.W.,
Washington, DC 20590.


## INCIDENCE OF REPEAT OFFENDERS IN SELECTED STATES[1]

### DRIVERS CONVICTED OF DWI

| STATE | NO. DRIVERS CONVICTED OF | NO. WITH PRIOR DWI | YEAR [2] | PERCENT REPEAT DWI |
|---|---|---|---|---|

| | DWI | CONVICTION | | OFFENDERS[3] |
|---|---|---|---|---|
| Iowa | 18,000 | 3,780 | 1992 (6 yrs) | 21% |
| Louisiana | 101,161 | 24,918 | 89-93 (5 yrs) | 24% |
| Nebraska | 146,619 | 38,547 | 65-94 (30 yrs) | 26% |
| Wisconsin | 169,390 | 52,073 | 84-88 (5 yrs) | 31% |
| North Carolina | 65,714 | 21,028 | 1988 (7 yrs) | 32% |
| Ohio | 637,678 | 211,280 | 80-93 (5 yrs) | 33% |
| California | 216,453 | 72,728 | 1991(7 yrs) | 34% |
| New Mexico | 16,184 | 7,637 | 1990 (30 yrs) | 47% |

## DRIVERS ARRESTED FOR DWI

| STATE | NO. DRIVERS ARRESTED FOR DWI | NO. WITH PRIOR DWI ARREST | YEAR [2] | PERCENT REPEAT DWI OFFENDERS[3] |
|---|---|---|---|---|
| South Dakota | 8,821 | 2,090 | 1993 (5 yrs) | 24% |
| Colorado | 99,848 | 26,335 | 89-91(5 yrs) | 26% |
| Texas | 352,372 | 125,941 | 87-90 (10 yrs) | 36% |
| Minnesota | 30,717 | 14,034 | 1993 (30 yrs) | 46% |

[1] These twelve states may not be necessarily representative of all fifty states in the U.S.

[2] Years in parentheses indicate the number of years in which the records of prior DWI offenses were available. In general, the percent of repeat offenders was greater in states that retained driving records for longer periods of time (NM, TX, MN).

[3] These percentages may be conservative. Some drivers arrested or convicted of DWI in one state may have DWI arrests or convictions in another state that were not identified or were not in the current driver record.

U.S. Department of Transportation
**National Highway**
**Traffic Safety**

3/30/2015 4:31 PM

**Administration**
400 Seventh Street, S.W. NTS-33
Washington, DC 20590

TRAFFIC TECH is a publication to disseminate information about traffic safety programs, including evaluations, innovative programs, and new publications. Feel free to copy it as you wish.

If you would like to receive a copy contact:
Linda Cosgrove, Ph.D., Editor,
Evaluation Staff Traffic Safety Programs
(202) 366-2759